Walter H. Bithell (ISB #1206)
William G. Myers III (ISB #5598)
A. Dean Bennett (ISB #7735)
HOLLAND & HART LLP
800 W. Main Street, Suite 1750
P.O. Box 2527
Boise, Idaho  83701-2527
Telephone:  (208) 342-5000
Facsimile:  (208) 343-8869
E-mail:     wbithell@hollandhart.com
            wmyers@hollandhart.com
            adbennett@hollandhart.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MICKELSEN FARMS, LLC, an Idaho limited liability company; RIGBY PRODUCE, INC., an Idaho corporation; WATTENBARGER FARMS, an Idaho general partnership; ADAM and BROOKE NEIBAUR, husband and wife, d/b/a CRIPPLE CREEK FARMS; CAROL A. ANDERSON FARMS TRUST; MARK ANDERSON, Trustee; KORY FRANCE, an individual; GERALD OLER, an individual, d/b/a/ OLER FARMS; BOHEMIAN, LLC, an Idaho limited liability company; GERALD and HELEN KELLEY, husband and wife; CRAIG V. and ANDREA KELLEY, husband and wife, DAN G. and KAREN K. ELDREDGE, husband and wife; LAMOND COOK, an individual, | Case No. 15-cv-143 **COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF** |
| Plaintiffs, | |
| v. | |
| ANIMAL AND PLANT HEALTH INSPECTION SERVICE; TOM VILSACK, in his capacity as the United States Secretary of Agriculture; KEVIN SHEA, in his capacity as the Administrator of the Animal and Plant Health Inspection Service; BRIAN MARSCHMAN, in his capacity as the Idaho Plant Health Director, Animal and Plant Health | |

Inspection Service; TINA GRESHAM, in her
capacity as Director of Pale Cyst Nematode
Program, Animal and Plant Health Inspection
Service; IDAHO STATE DEPARTMENT OF
AGRICULTURE; and CELIA R. GOULD, in
her capacity as the Director of the Idaho State
Department of Agriculture,

                    Defendants.

**INTRODUCTION**

1.      Plaintiffs Mickelsen Farms, LLC; Rigby Produce, Inc.; Wattenbarger Farms; Adam and Brook Neibaur, d/b/a Cripple Creek Farms; Mark Anderson as trustee of the Carol A. Anderson Farms Trust; Kory France; Gerald Oler, d/b/a/ Oler Farms; Bohemian, LLC; Gerald and Helen Kelley; Craig V. and Andrea Kelley; Dan G. and Karen K. Eldredge; and LaMond Cook (collectively "Plaintiffs") bring this action against Defendants Animal and Plant Health Inspection Service ("APHIS"); Tom Vilsack, United States Secretary of Agriculture; Kevin Shea, Administrator of APHIS; Brian Marschman, Idaho Plant Health Director; and Tina Gresham, Director of Pale Cyst Nematode Program (collectively "APHIS"); and the Idaho State Department of Agriculture ("ISDA") and Celia Gould, Director of ISDA (collectively "ISDA") to challenge certain agency actions taken by APHIS and ISDA governing pale cyst nematodes, which agency actions are adversely affecting Plaintiffs and their livelihoods.  *See, e.g, Pale Cyst Nematodes' Quarantine and Regulations, Final Rule*, 74 Fed. Reg. 19374-19382 (Apr. 29, 2009) (the "Final Rule").

2.      Plaintiffs bring this action to address APHIS's failure to comply with its legal obligations under the : (1) Plant Protection Act, 7 U.S.C. §§ 7701 to 7786; (2) Administrative Procedure Act, 5 U.S.C. §§ 553, 701-706; (3) National Environmental Policy Act, 42 U.S.C. §§ 4321-70; (4) Federal Advisory Committee Act, 5 U.S.C. App. 2, §§ 1-16; (5) Tenth Amendment of the United States Constitution; and (6) to otherwise challenge APHIS's actions as arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law, and without observance of procedures required by law.

3.      Plaintiffs also bring this action to address ISDA's failure to comply with its legal obligations under Idaho Plant Pest Act, Idaho Code §§ 22-2001 to 22-2023, the Idaho Administrative Procedure Act, Idaho Code §§ 67-5101 to 67-5292, Idaho's Rules Governing the

Pale Cyst Nematode (*Globodera Pallida*), IDAPA 02.06.10, and to otherwise challenge ISDA's actions as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) because this action arises under the laws of the United States, including the Plant Protection Act ("PPA"), 7 U.S.C. § 7736, Administrative Procedure Act ("APA"), 5 U.S.C. §§ 553, 601-612, 701-706, National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-70, Federal Advisory Committee Act ("FACA"), 5 U.S.C. App. 2, §§ 1-16, Tenth Amendment of the United States Constitution, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

5.     This Court has jurisdiction over Plaintiffs' claim made against ISDA pursuant to this Court's supplemental jurisdiction under 28 U.S.C. § 1367.

6.     An actual, justiciable controversy now exists between Plaintiffs, APHIS, and ISDA, and the requested relief is proper under the APA, 5 U.S.C. §§ 701–706; the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202; and other authority cited herein.

7.     The federal government has waived sovereign immunity in this action pursuant to the APA, 5 U.S.C. § 702.  The State of Idaho has waived sovereign immunity in this action pursuant to the Idaho APA, Idaho Code § 67-5270.

8.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because this action is brought against one or more officers of the Department of Agriculture who reside in the District of Idaho, because a substantial part of the events giving rise to Plaintiffs' claims occurred in the District of Idaho, and because all of the property that is the subject of this action is in the District of Idaho.  Further, actions and decisions challenged by this lawsuit were taken or made in substantial part in the District of Idaho.  Dist. Idaho Loc. R. 3.1.

9. This Court may award costs and attorneys' fees and expenses to Plaintiffs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(a), (d) as against APHIS.  As against ISDA this Court may award costs and attorneys' fees and expenses to Plaintiffs pursuant to Idaho Code § 12-117 and other applicable Idaho law.

## PARTIES

### Plaintiffs

10. Mickelsen Farms, LLC ("Mickelsen Farms") is an Idaho limited liability company, with its principal place of business located in Jefferson County, Idaho.  Mickelsen Farms operates fifth and sixth generation family farms in Bingham, Bonneville, and Jefferson Counties, Idaho.  Mickelsen Farms grows potatoes and seed potatoes as well as canola, wheat, and alfalfa.  Mickelsen Farms employs over 100 people at peak season in its farming operations.

11. Rigby Produce, Inc. ("Rigby Produce") is an Idaho corporation in Jefferson County, Idaho.  Rigby Produce packages potatoes grown in eastern Idaho and it employs between 100-120 people in its packaging operations.

12. Wattenbarger Farms is an Idaho general partnership located in Bonneville County, Idaho.  Wattenbarger Farms owns or leases approximately 4000 acres where it grows potatoes and wheat in Bingham and Bonneville Counties, Idaho.

13. Adam and Brooke Neibaur, husband and wife, reside in Bingham County, Idaho, and do business under the assumed name of Cripple Creek Farms.  Cripple Creek Farms grows potatoes, grain, and hay on over 1000 acres in Bingham County, Idaho.

14. Mark Anderson is the trustee of the Carol A. Anderson Farms Trust.  The Carol A. Anderson Farms Trust owns over 400 acres that is leased to farmers to grow potatoes, grain, and hay in and around Bingham County, Idaho.

15.     Kory France is an individual who resides in Bonneville County, Idaho. Mr. France leases and farms over 500 acres to grow potatoes and grain in and around Bingham County, Idaho. Mr. France also provides custom farming services in and around Bingham County, Idaho.

16.     Gerald Oler is an individual who resides in Bonneville County, Idaho and does business as Oler Farms. Mr. Oler owns over 1500 acres and in any given year leases another 600 or more acres for farming potatoes and barley in and around Bingham County, Idaho.

17.     Bohemian, LLC is an Idaho limited liability company with its principal place of business located in Bingham County, Idaho. Bohemian owns approximately 114 acres used primarily to plant hay and run cattle in Bingham County, Idaho.

18.     Gerald and Helen Kelley are husband and wife and reside in Bingham County, Idaho. They farm hay and own approximately 60 cattle in Bingham County, Idaho.

19.     Craig V. and Andrea Kelley, husband and wife, and Dan G. and Karen K. Eldredge, husband and wife, reside in Bingham County, Idaho. Together, they farm hay and own approximately 35 cattle in Bingham County, Idaho.

20.     LaMond Cook is an individual residing in Bingham County, Idaho. Mr. Cook owns approximately 142 acres that he leases for growing potatoes in Bingham County, Idaho.

21.     As a result of APHIS's and ISDA's conduct described herein, each of the Plaintiffs is under quarantine or regulation by APHIS and ISDA or has been otherwise directly injured by APHIS's and ISDA's actions.

**<u>Defendants</u>**

22.     APHIS is a federal agency within the United States Department of Agriculture that has been delegated the responsibility for ensuring compliance with federal law, including the PPA, APA, NEPA and FACA, and is the federal agency that prepared and approved the Final

Rule and that has applied and enforced ad hoc protocols and rules outside of those authorized by the PPA or the Final Rule.

23.     Tom Vilsack is the United States Secretary of Agriculture, sued in his official capacity.  The Secretary is the official ultimately responsible for the approval of the Final Rule, promulgation of APHIS's regulations, and for the Department's compliance with federal law, including the PPA, APA, NEPA, and FACA.

24.     Kevin Shea is the Administrator of APHIS, sued in his official capacity.  The Secretary of Agriculture has delegated responsibility to the Administrator of APHIS to ensure compliance with federal law, including the PPA, APA, NEPA, and FACA.

25.     Brian Marschman is the Idaho Plant Health Director for APHIS, sued in his official capacity.  The Secretary of Agriculture and the Administrator of APHIS have delegated certain responsibilities to the Idaho Plant Health Director to ensure compliance with federal law.

26.     Tina Gresham is the Director of Pale Cyst Nematode Program for APHIS, sued in her official capacity.  The Secretary of Agriculture and Messrs. Shea and Marschman have delegated certain responsibilities to the Director of Pale Cyst Nematode Program to ensure compliance with federal law.

27.     ISDA is a state agency responsible for plant and insect programs within Idaho and for ensuring such programs comply with, and are applied and enforced consistent with, state and federal law.

28.     Celia R. Gould is the Director of the Idaho State Department of Agriculture, sued in her official capacity.  The Director is the official ultimately responsible for ensuring that the State of Idaho's programs regarding plant and insect programs comply with, and are applied and enforced consistent with, state and federal law.

# LEGAL BACKGROUND

## I.   PLANT PROTECTION ACT ("PPA")

29.     The PPA is codified at 7 U.S.C. §§ 7701 to 7786.  It provides that the Secretary of Agriculture may issue regulations "to prevent the introduction of plant pests into the United States or the dissemination of plant pests within the United States."  7 U.S.C. § 7711(a).

30.     The PPA also provides that the Secretary of Agriculture must ensure that the processes used in developing regulations related to the importation, entry, exportation, or movement in interstate commerce of plant pests are, among other things, transparent and accessible.  7 U.S.C. § 7712.

## II.   NATIONAL ENVIRONMENTAL POLICY ACT ("NEPA")

31.     NEPA is the "basic national charter for protection of the environment."  40 C.F.R. § 1500.1(a).

32.     "The NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment."  *Id.* § 1500.1(c).  NEPA's twin goals are to:  (1) foster informed decision-making by "ensur[ing] that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts," and (2) promote informed public participation by requiring full disclosure of and opportunities for the public to participate in governmental decisions affecting environmental quality.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349-50 (1989).

33.     Pursuant to NEPA, if a federal agency proposes a major federal action with significant environmental effects, the agency must prepare an Environmental Impact Statement ("EIS"), discussing the environmental impacts of and alternatives to the proposed action. 42 U.S.C. § 4332(2)(C)(i), (iii); 40 C.F.R. § 1508.11.

34.     To determine whether an EIS is necessary, an agency may first prepare an Environmental Assessment ("EA").  40 C.F.R. §§ 1501.4(c), 1508.9.  An EA is a "concise public document . . . that serves to . . . [b]riefly provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a finding of no significant impact."  *Id.* § 1508.9.  An EA must contain sufficient information and analysis to determine whether the proposed action is likely to have significant impacts, thus requiring preparation of an EIS.  *Id.*

35.     If an agency concludes, based on the EA, that an EIS is not required, it must prepare a finding of no significant impact ("FONSI"), which explains the agency's reasons for its decision.  *Id.* §§ 1501.4(e), 1508.13.

36.     The analysis of alternatives to a proposed agency action is "the heart of the NEPA" document, and agencies should "[r]igorously explore and objectively evaluate all reasonable alternatives."  *Id.* § 1502.14(a).  The analysis must include a "no action" alternative, as well as reasonable alternatives beyond the agency's jurisdiction.  *Id.* § 1502.14(c)-(d).  These alternative analysis requirements apply to both EISs and EAs.  *See* 42 U.S.C. § 4332(2)(E); 40 C.F.R. § 1508.9(b).

37.     Where ongoing federal action and control remains, and there are new circumstances or information relevant to environmental concerns or bearing on the agency's action or its impacts, a federal agency must determine under NEPA whether to supplement or update its prior NEPA analysis.  *See* 40 C.F.R. § 1502.9(c)(1).

38.     Federal agencies must ensure the professional integrity, including the scientific integrity, of the analysis in EIS's.  40 C.F.R. § 1502.24.

## III.    FEDERAL ADVISORY COMMITTEE ACT ("FACA")

39.     Pursuant to FACA, no advisory committee shall be established by a federal agency unless such establishment is "determined as a matter of formal record, by the head of the

agency involved after consultation with the Administrator [of General Services] with timely notice published in the Federal Register, to be in the public interest in connection with the performance of duties imposed on that agency by law."  5 U.S.C. App. 2, § 9(a)(2).

40.     No advisory committee shall "meet or take any action until an advisory committee charter has been filed . . . with the head of the agency to whom any advisory committee reports and with the standing committees of the Senate and House of Representatives have legislative jurisdiction of such agency."  5 U.S.C. App. 2, § 9(c).

41.     The term "advisory committee" means "any committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof  . . . which is . . . established or utilized by one or more agencies, in the interest of obtaining advice or recommendations for the President or one or more agencies or officers of the Federal Government, except that such term excludes (i) any committee that is composed wholly of full-time, or permanent part-time, officers or employees or the Federal Government." 5 U.S.C. App. 2, § 3(2).

42.     Agency heads or other federal officials creating an advisory committee shall "require the membership of the advisory committee to be fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee."  5 U.S.C. App. 2, § 5(b)(2), (c).

43.     Advisory committees must meet certain prescribed requirements and follow certain prescribed procedures, including:

      a)     Each advisory committee meeting shall be open to the public.

      b)     Timely notice of each such meeting shall be published in the Federal Register, and the Administrator shall prescribe regulations to provide for

other types of public notice to insure that all persons are notified of such

meeting prior thereto.

c)      Interested persons shall be permitted to attend, appear before, or file

statements with any advisory committee, subject to such reasonable rules

or regulations as the Administrator of General Services may prescribe.

d)      Subject to section 552 of title 5, United States Code, the records, reports,

transcripts, minutes, appendices, working papers, drafts, studies, agenda,

or other documents which were made available to or prepared for or by

each advisory committee shall be available for public inspection and

copying at a single location in the offices of the advisory committee or the

agency to which the advisory committee reports until the advisory

committee ceases to exist.

e)      Detailed minutes of each meeting of each advisory committee shall be

kept and shall contain a record of the persons present, a complete and

accurate description of the matters discussed and conclusions reached, and

copies of all reports received, issued, or approved by the advisory

committee.  The accuracy of all minutes shall be certified to by the

chairman of the advisory committee.

f)      There shall be a designated officer or employee of the Federal

Government to chair or attend each meeting of each advisory committee.

No advisory committee shall conduct any meeting in the absence of that

officer or employee.

g)      Advisory committees shall not hold any meetings except at the call of, or

with the advance approval of, a designated officer or employee of the

federal government, and with an agenda approved by such officer or

employee.  5 U.S.C. App. 2, § 10.

IV.    ADMINISTRATIVE PROCEDURE ACT ("APA")

44.    The APA provides for judicial review of final agency action by persons

"aggrieved" by such action.  5 U.S.C. § 702.  The actions reviewable under the APA include any

"preliminary, procedural, or intermediate agency action or ruling . . . on the review of the final

agency action."  *Id.* § 704.

45.    Pursuant to the APA, a reviewing court shall "hold unlawful and set aside agency

action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  A reviewing court shall "hold

unlawful and set aside agency action, findings, and conclusions found to be . . . without

observance of procedure required by law."  5 U.S.C. § 706(2)(D).

46.    The APA standards apply when a federal agency proposes and adopts substantive

or legislative rules.  *Id.* §§ 553, 551(4).  Specifically, agencies must provide "[g]eneral notice" of

any "proposed rulemaking" to the public through publication in the Federal Register.  That

notice must include "(1) a statement of the time, place, and nature of the public rule making

proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either

the terms or substance of the proposed rule or a description of the subjects and issues involved."

*Id.* § 553(b).  An agency's responsibility to consider public comments on a proposed rulemaking

is required by 5 U.S.C. § 553(c).

V.    THE TENTH AMENDMENT

47.    The Tenth Amendment provides that "[t]he powers not delegated to the United

States by the Constitution, nor prohibited by it to the States, are reserved to the States

respectively, or to the people."  U.S. Const. amend. X.

48.     The Tenth Amendment has been interpreted to prohibit Congress from commandeering the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program.  *See New York v. United States*, 505 U.S. 144, 161 (1992).

## FACTUAL BACKGROUND

### I.     PALE CYST NEMATODE OR "PCN"

49.     Pale Cyst Nematode ("PCN"), *Globodera pallida*, is a pest of potato crops.  The microscopic nematode poses no threat to human health and never actually enters the tuber of a potato.  Some foreign studies suggest that PCN can reduce potato yields through root damage if present in a large enough number.

50.     Although prevalent in South America and Europe, PCN had never been detected in the United States before it was found in Idaho in 2006.

51.     There have been no known occurrences in Idaho or elsewhere in the United States where PCN has reduced the yield of potatoes.

### II.     DISCOVERY OF PCN IN IDAHO

52.     On April 19, 2006, APHIS announced the detection of PCN in eastern Idaho.  APHIS discovered PCN through a survey of tare soil at an ISDA grader facility.  After this detection, APHIS conducted soil sample testing from a number of fields that provided potatoes to the ISDA grader facility on the day the positive tare soil was collected.  As a result of the sample testing, APHIS determined that at least one field contained PCN.

53.     APHIS published an interim rule in the Federal Register on September 12, 2007, quarantining and regulating certain parts of Bingham and Bonneville Counties, Idaho.  72 Fed. Reg. 51975-51988 (Sept. 12, 2007) ("Interim Rule").

54.     On April 29, 2009, APHIS adopted the Interim Rule, with some changes, as a Final Rule.  *See* 74 Fed. Reg. 19374-19382 (Apr. 29, 2009).  The Final Rule is codified at 7 C.F.R. §§ 301.86-301.89.

55.     Pursuant to the Final Rule, the Administrator of APHIS will designate an entire State as quarantined unless the Administrator determines that the State has adopted restrictions on the intrastate movement of regulated articles that are equivalent to the interstate requirements promulgated by APHIS.

56.     Pursuant to the Final Rule, the Administrator of APHIS may designate "infested fields" and "associated fields."  A designation of "infested field" or "associated field" will subject a grower's field to quarantine or regulation by APHIS.

57.     Pursuant to the Final Rule, the Administrator will designate a field as an "infested field" when PCN is found in the field.

58.     Pursuant to the Final Rule, an "associated field" is a field where a PCN host crop has been grown in the last 10 years, and where the field: (1) shares a border with an "infested field;" (2) the field came into contact with a regulated article from an "infested field" within the last 10 years, or (3) within the last 10 years the field shared ownership, tenancy, seed, drainage or runoff, farm machinery, or other elements of shared cultural practices with an "infested field" that could allow spread of the pale cyst nematode, as determined by the Administrator.  This portion of the Final Rule is referred to herein as the "10-year look back" provision.

59.     Pursuant to the Final Rule, an "infested field" or an "associated field" will be removed from quarantine, and thus removed from regulation by APHIS, only after the field has been found to be free of PCN according to a protocol to be approved by the Administrator after the promulgation of the Final Rule.  7 C.F.R. § 301.86-3; 74 Fed. Reg. 19376 (Apr. 29, 2009).

60.     APHIS has not issued a protocol approved by the Administrator for public review or comment related to the deregulation of an "infested field" or an "associated field. Indeed, Plaintiffs are unaware of any written "protocol" formulated or drafted by APHIS for this purpose. On information and belief, to date, APHIS has instead applied ad hoc and ever-changing informal protocols in its designation and de-designation of "infested fields" and "associated fields."

61.     After APHIS detected PCN in Idaho, and after it promulgated the Interim Rule, APHIS designated certain fields farmed by certain Plaintiffs as "infested" or "associated," placing the fields under APHIS's quarantine regulations. The effective date of the Interim Rule was November 1, 2007. Beginning on that date, APHIS imposed strict sanitation and washing requirements on certain Plaintiffs to prevent movement of PCN out of the fields. Plaintiffs abided by the APHIS requirements.

62.     In or about 2009, APHIS informed many Plaintiffs that certain testing and surveys showed that the fields owned or farmed by Plaintiffs were PCN free, and therefore those fields that had been designated "infested" or "associated" by APHIS pursuant to the Interim Rule and Final Rule were released from APHIS regulation. Plaintiffs are unaware of the scope of the testing and surveys referenced by APHIS because APHIS has not made any deregulation protocol public.

63.     After APHIS released those fields, some Plaintiffs initiated their own sanitation and washing standards to guard against future designation of uninfested fields as "associated fields." Those Plaintiffs implemented their own standards after their fields became deregulated. The same standards remain in effect.

### III.   THE TECHNICAL WORKING GROUP

64.     As part of its regulation of PCN, APHIS selected an international group of individuals to form what it calls the Technical Working Group.  The Technical Working Group consists of at least 16 members and three observers including non-federal members from a number of states and foreign governments.

65.     On information and belief, no private sector potato growers or potato farm land owners were invited to be members of the Technical Working Group, or to provide opinions, advice, or recommendations to the Technical Working Group.

66.     The purpose of the Technical Working Group is to provide advice and recommendations to APHIS for the control of PCN based on current scientific information.  The Technical Working Group has provided advice and has made recommendations to APHIS that form the basis of many of APHIS's ad hoc protocols as well as APHIS's decision to delay development of protocols until the publication of the Final Rule.

67.     On information and belief, APHIS has adopted some of the opinions, advice, or recommendations of the Technical Working Group as though they are promulgated regulations.

68.     On information and belief, the opinions, advice, or recommendations of the Technical Working Group form the basis of many of APHIS's ad hoc protocols.

### IV.   THE CANADA AND UNITED STATES GUIDELINES

69.     Certain guidelines called the Canada and United States Guidelines on Surveillance and Phytosanitary Actions for the Potato Cyst Nematodes *Globodera rostochiensis and Globodera pallida* have been created by the Canadian Food Inspection Agency and APHIS ("Canada and United States Guidelines").  While there are multiple iterations of the Canada and United States Guidelines, the latest version is dated May 7, 2014.

70.     The Canada and United States Guidelines state that they are regulatory, and, among other things, outline measures to be taken on the detection of PCN, provide guidance on management or the release of regulated areas, and establish requirements for the movement of regulated articles including potatoes.

71.     On information and belief, APHIS has adopted some of the methods and protocols in the Canada and United States Guidelines as though they are APA-promulgated regulations.

72.     On information and belief, the Canada and United States Guidelines form the basis of many of APHIS's ad hoc protocols.

## V.     POST-REGULATION MONITORING OF PLAINTIFFS' FIELDS IN 2011

73.     At the same time APHIS was releasing fields from its federal regulatory control, including fields owned or farmed by Plaintiffs, it was undertaking back-channel efforts to engage in unauthorized activities including continued "monitoring" and "surveillance" of deregulated fields.

74.     Internal APHIS correspondence indicates that this additional "monitoring" and "surveillance" would include a testing regime that would consist of four additional surveys, each one to be conducted as soon as possible after a PCN host crop was grown in a deregulated field. And then, even if the deregulated field was negative for all four surveys, the owners or farmers of the deregulated field would still be expected to allow additional APHIS testing.

75.     APHIS delegated, at least in part, its "monitoring" and "surveillance" testing regime of deregulated fields to ISDA.

76.      APHIS, through ISDA, thereafter requested Plaintiffs' permission to conduct testing of deregulated fields farmed by Plaintiffs.  Numerous Plaintiffs, knowing their fields were

deregulated, and relying on APHIS's representations that it had no authority to regulate the deregulated fields owned or farmed by Plaintiffs, denied APHIS's request.

77.    APHIS, through ISDA, has procured search warrants to force at least one Plaintiff, Mickelsen Farms, to allow the testing of the deregulated fields that it had farmed.  The deregulated fields were not within APHIS's federal regulatory control.

78.    On the basis of these search warrants, in the fall of 2011, APHIS, through ISDA, tested the deregulated fields farmed by Mickelsen Farms.  All of the deregulated fields tested came back negative for PCN.  APHIS again told Mickelsen Farms that the deregulated fields farmed by it were not subject to further regulation by APHIS.

## VI.    MORE POST-REGULATION TESTING OF PLAINTIFFS' FIELDS IN 2014

79.    In 2013 and 2014, APHIS, through ISDA, notified some Plaintiffs that certain deregulated fields owned or previously farmed by Plaintiffs had been overlooked by APHIS during prior testing of the deregulated fields.

80.    In 2013 and 2014, APHIS, through ISDA, and over the objection of many Plaintiffs, undertook the testing of these fields even though the fields were deregulated and outside of APHIS's and ISDA's regulatory control.

## VII.    APHIS DESIGNATES AN OVERLY BROAD NUMBER OF "ASSOCIATED FIELDS"

81.    Due to its testing of deregulated fields in 2013 and 2014, and pursuant to the Final Rule, APHIS designated certain fields as "infested fields."  Once a field is designated as infested, the Final Rule then required APHIS to designate "associated fields" which are also subject to quarantine or regulation by APHIS.

82.    Using the 10-year look back in the Final Rule, APHIS informed Plaintiffs that it was considering all or nearly all of the fields owned or farmed by Plaintiffs as possible "associated fields" because those acres had been farmed since 2005.  APHIS then told Plaintiffs

that it was their burden to demonstrate to APHIS which of the fields were *not* exposed to the infested fields by contemporaneous documentary evidence.

83.     APHIS improperly forced Plaintiffs to prove a negative by demanding that they produce documentation such as handwritten notes, calendar or planner entries, tractor logs, emails, scale tickets, or any other original source documentation to demonstrate that fields they owned or farmed were *not* associated fields.  Many Plaintiffs nonetheless did provide APHIS with the documentation it requested, including documentation as to Plaintiffs' self-imposed sanitation standards.

84.     Even after Plaintiffs submitted the information requested by APHIS showing that there is no risk of the spread of PCN from infested fields owned or farmed by Plaintiffs, APHIS still designated a number of those as "associated fields" without any basis for the designation.

85.     Since at least 2011, and consistent with its conduct since 2007, APHIS has applied ad hoc and impossible-to-satisfy conditions on Plaintiffs, without a basis in law or fact to do so.

86.     APHIS has no written protocol for deregulating fields.  It is therefore completely unclear how an "infested field" or an "associated field" becomes deregulated, if ever.

87.     APHIS has told many Plaintiffs, in writing, that when the newly quarantined or regulated fields owned or farmed by Plaintiffs become deregulated, the fields will still be subject to testing after at least each of the next three host crops are planted in the fields.  APHIS's unauthorized testing will have the effect of regulating Plaintiffs' deregulated fields for at least 15 to 20 additional years after APHIS deregulates the fields.

88.     APHIS's application and enforcement of the Final Rule and its ad hoc protocols are having and will have significant adverse impacts on Plaintiffs.

## VIII.   APHIS's Use of Methyl Bromide

89.     Methyl Bromide is a highly toxic fumigant used as a pesticide.  While the application of Methyl Bromide is known to be toxic to humans and livestock, APHIS has not adequately studied or evaluated the application of Methyl Bromide to attempt to eradicate or control PCN.

90.     In June of 2004, APHIS issued an Environmental Assessment related to the use of Methyl Bromide for generalized quarantine use ("2004 EA").

91.     In May of 2007, APHIS issued an environmental assessment to address, among other things, the use of Methyl Bromide as a way to eradicate PCN in Bingham County, Idaho ("May 2007 EA").

92.     In July of 2007, APHIS issued an amended environmental assessment to address changes to the fumigant formulation of the Methyl Bromide product ("July 2007 EA").

93.     In August of 2007 APHIS issued a finding of no significant environmental impact related to the use of Methyl Bromide in Bingham County, Idaho ("2007 FONSI").  By the terms of the 2007 FONSI, the use of Methyl Bromide "could extend as long as 7 years," ending in August of 2014.

94.     In April of 2007 APHIS issued an addendum to the 2007 FONSI related to certain limited changes to its use of Methyl Bromide in Bingham County, Idaho ("2007 FONSI Addendum").

95.     On information and belief, since the 2004 EA and the July 2007 EA and FONSI, APHIS has made substantial changes to the way it uses Methyl Bromide with regard to PCN quarantine and regulation.  There are significant new circumstances and information relevant to the environmental effects from the use of Methyl Bromide that bears on its continued use in the PCN program.

96.     APHIS application of Methyl Bromide to certain fields owned or farmed by Plaintiffs has caused, among other things, significant disruption to Plaintiffs' farm operations, has made farm crops toxic and unsellable, and has caused disease and death to livestock owned by multiple Plaintiffs.

97.     On information and belief, APHIS has not issued any further environmental assessments, findings of no significant impact, or environmental impact statements regarding its continued use of Methyl Bromide as part of its PCN program.

98.     APHIS has used Methyl Bromide with regard to PCN quarantine and regulation after expiration of the 7-year term identified in the 2007 FONSI.

### FIRST CLAIM FOR RELIEF
### (Violation of APA and PPA – APHIS's Failure to Comply with Rulemaking Requirements in Issuing the Final Rule)

99.     Plaintiffs incorporate by reference each of the allegations in paragraphs 1 through 98.

100.    The PPA requires the Secretary to ensure that the processes used in developing regulations related to plant pests are, among other things, transparent and accessible.  7 U.S.C. § 7712.

101.    APHIS is required to comply with APA notice and comment procedures when formulating and issuing substantive or legislative rules.  5 U.S.C. §§ 553, 551(4).

102.    APA procedural requirements apply not only to those rules which an agency denominates as such but also to other agency pronouncements that can, as a practical matter, have a binding effect.

103.    Where the Final Rule has a binding effect, APHIS was required to comply with APA notice and comment procedures when it formulated and issued the Final Rule.  5 U.S.C. § 553(b)–(d).

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF - 19

104.     APHIS violated its APA notice and comment duties when it formulated and issued the Final Rule without: (1) notifying the public through publication in the Federal Register that APHIS was proposing to issue the Final Rule; (2) providing the public an opportunity to submit written comments on the a draft Final Rule; and (3) publishing the Final Rule in the Federal Register at least 30 days prior to its effective date.  5 U.S.C. § 553(b)–(d).

105.     By not complying with PPA regarding formulating and issuing the Final Rule, APHIS acted arbitrarily, capriciously, not in accordance with law or the procedure required by law, entitling Plaintiffs to the relief requested below.

106.     By not complying with APA notice and comment procedures regarding formulating and issuing the Final Rule, APHIS acted arbitrarily, capriciously, not in accordance with law or the procedure required by law, entitling Plaintiffs to the relief requested below.

### SECOND CLAIM FOR RELIEF
### (Violation of APA and PPA – APHIS's Failure to Comply with Rulemaking Procedures in Adopting the Ad Hoc Protocols)

107.     Plaintiffs incorporate by reference each of the allegations in paragraphs 1 through 106.

108.     The Final Rule contemplates further rulemaking in that it requires the creation of a future "protocol" to be used to support removal of infested and associated fields from regulation.  APHIS has not issued proposed or final regulations defining such protocols.  Yet, APHIS purports to have previously used, and to currently using, a deregulation protocol.

109.     APA procedural requirements apply not only to those rules which an agency denominates as such but also to other agency pronouncements that can, as a practical matter, have a binding effect.

110.     APHIS's ad hoc protocols have a binding effect.  Therefore, APHIS was required to comply with APA notice and comment procedures when it formulated and issued the protocols.  5 U.S.C. § 553(b)–(d).

111.     APHIS's adoption of the Canada and United States Guidelines has a binding effect.  Therefore, APHIS was required to comply with APA notice and comment procedures when it adopted the Guidelines.  5 U.S.C. § 553(b)–(d).

112.     APHIS's adoption of the opinions, advice, and recommendations of the Technical Working Group has a binding effect.  Therefore, APHIS was required to comply with APA notice and comment procedures when it adopted those opinions, advice, and recommendations. 5 U.S.C. § 553(b)–(d).

113.     By not complying with the APA notice and comment procedures, APHIS acted arbitrarily, capriciously, not in accordance with law or the procedure required by law pursuant to the APA and PPA, entitling Plaintiffs to the relief requested below.

### THIRD CLAIM FOR RELIEF
### (Violation of APA and PPA – APHIS's Application of Ad Hoc Protocols to Plaintiffs is Arbitrary and Capricious, an Abuse of Discretion, Not in Accordance with Law)

114.     Plaintiffs incorporate by reference each of the allegations in paragraphs 1 through 113.

115.     APHIS has used the Final Rule and its ad hoc protocols to regulate, deregulate, and reregulate numerous fields owned or farmed by Plaintiffs and to unlawfully monitor and surveil fields owned or farmed by Plaintiffs.

116.     APHIS's ad hoc and ever-changing protocols have put, and will continue to put, fields owned or farmed by Plaintiffs into a circuitous and undefined state of regulation for an undefined period of time.

117.     APHIS has applied and continues to apply ad hoc and impossible-to-satisfy conditions on Plaintiffs.  APHIS continues to change and add to the ad hoc conditions it has placed on Plaintiffs without a basis in law or fact to do so.

118.     APHIS's application of the Final Rule and the ad hoc protocols to Plaintiffs, as described above, is arbitrary and capricious, constitutes an abuse of discretion, and is otherwise not in accordance with law, entitling plaintiffs to the relief requested below.

### FOURTH CLAIM FOR RELIEF
### (Violation of FACA and APA – APHIS's Failure to Comply with FACA Procedures)

119.     Plaintiffs incorporate by reference each of the allegations in paragraphs 1 through 118.

120.     APHIS is required to comply with FACA procedures when establishing and conducting advisory committees.  5 U.S.C. App. 2, §§ 1-16.

121.     Under the APA, this Court has authority to "hold unlawful and set aside agency actions found to be arbitrary, capricious, an abuse of discretion or not in accordance with the law," 5 U.S.C. § 706(2)(A), and to set aside an agency decision "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

122.     The Technical Working Group was an advisory committee within the meaning of FACA.  APHIS was required to comply with FACA procedures when it established the Technical Working Group.

123.     On information and belief, APHIS violated its nondiscretionary FACA duties by not establishing the Technical Working Group following a determination as a matter of formal record, with timely notice published in the Federal Register, that the Technical Working Group was in the public interest.

124.    Based on information and belief, APHIS violated its nondiscretionary FACA duties by not filing an advisory committee charter with the Senate and House of Representatives having legislative jurisdiction over APHIS before convening the Technical Working Group.

125.    APHIS violated its nondiscretionary FACA duties by not ensuring that membership of the Technical Working Group was fairly balanced by including Plaintiffs' points of view.

126.    Based on information and belief, APHIS violated its nondiscretionary FACA duties by not meeting the following requirements, among others:

   a)    Having the Technical Working Group meetings open to the public;

   b)    Publishing timely notice of the Technical Working Group meetings in the Federal Register;

   c)    Permitting interested persons or groups such as Plaintiffs to attend, appear before, or file statements with the Technical Working Group;

   d)    Making available for public inspection and copying the records, reports, transcripts, minutes, appendices, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by the Technical Working Group;

   e)    Keeping detailed minutes of the meeting of the Technical Working Group containing a record of the persons present, a complete and accurate description of the matters discussed and conclusions reached, and copies of all reports received, issued, or approved by the Technical Working Group; or

   f)    Certifying the accuracy of all minutes.

127.    By not complying with the FACA procedures regarding the Technical Working Group, APHIS violated the FACA, 5 U.S.C. App. 2, §§ 1-16, and acted arbitrarily, capriciously, not in accordance with law or the procedure required by law pursuant to the APA, entitling Plaintiffs to the relief requested below.

FIFTH CLAIM FOR RELIEF
**(Violation of NEPA and APA – APHIS's Failure to Prepare NEPA Review)**

128.    Plaintiffs incorporate by reference each of the allegations in paragraphs 1 through 127.

129.    APHIS is required to comply with NEPA procedures if it proposes or has ongoing major federal action that may have significant environmental effects.  42 U.S.C. §§ 4321-70.

130.    APHIS's actions, including its decisions to bring certain fields farmed by Plaintiffs under quarantine and regulation, including Methyl Bromide fumigation, are major federal actions with the potential for significant environmental effects.

131.    APHIS was required to comply with NEPA environmental evaluation procedures prior to quarantine and regulation of Plaintiffs fields, including prior to the ordering of Methyl Bromide fumigation.

132.    APHIS violated its NEPA duties when it took the actions set forth herein without considering the potential for significant environmental effects as required by NEPA.

133.    APHIS violated its NEPA duties when it took the actions set forth herein.  These actions are outside the scope of the 2004 EA, the 2007 EA, the 2007 FONSI, and/or the 2007 FONSI Addendum, and therefore have not been evaluated pursuant to NEPA.

134.    APHIS violated its NEPA duties by failing to supplement its 2004 and 2007 EAs when substantial changes in its use of Methyl Bromide subsequently occurred, when significant new circumstances arose, and when additional information became available.

135.    Upon information and belief, APHIS violated its NEPA duties when it failed to insure the scientific integrity of its NEPA analysis and when it failed to obtain the special expertise of other federal agencies such as the Environmental Protection Agency and Agricultural Research Service.

136.    By not complying with NEPA procedures regarding its actions, APHIS acted arbitrarily, capriciously, not in accordance with law or the procedure required by law pursuant to the APA, entitling Plaintiffs to the relief requested below.

### SIXTH CLAIM FOR RELIEF
### (ISDA's Violation of the Idaho APA)

137.    Plaintiffs incorporate by reference each of the allegations in paragraphs 1 through 136.

138.    The Idaho Plant Pest Act allows the ISDA to control PCN by rules and regulations.  Idaho Code § 22-2004.

139.    Idaho's Rules Governing the Pale Cyst Nematode *(Globodera Pallida)* are found at IDAPA 02.06.10 (the "Idaho PCN Rules").

140.    On March 2, 2015, ISDA sent Mickelsen Farms a formal notice stating that a number of Plaintiff Mickelsen Farms' fields were subject to ISDA's regulation pursuant to the Idaho PCN Rules.

141.    On March 18, 2015, Mickelsen Farms asked ISDA to reconsider its March 2, 2015 decision.   On April 2, 2015, ISDA denied Mickelsen Farms' request.

142.    Mickelsen Farms therefore timely seeks judicial review of this final agency action pursuant to Idaho Code § 67-5273(3).

143.    ISDA's application of and reliance on the Idaho PCN Rules for the regulation of Mickelsen Farms was arbitrary, capricious, an abuse of discretion, in excess of the statutory

authority of ISDA, not in accordance with law, and entitles Plaintiffs to the relief requested below.

144.    Pursuant to Idaho Code § 67-5229(1)(a), significant portions of the Idaho PCN Rules incorporate or rely upon the Final Rule and APHIS's protocols by reference.  Because the Final Rule and APHIS's protocols should be vacated and set aside, the portions of the Idaho PCN Rules incorporating or relying on the Final Rule or APHIS's protocols, in any way, should also be vacated and set aside.

**SEVENTH CLAIM FOR RELIEF**
**(Violation of APA and United States Constitution – APHIS's Regulation
Violates the Tenth Amendment)**

145.    Plaintiffs incorporate by reference each of the allegations in paragraphs 1 through 144.

146.    The PPA, 7 U.S.C. § 7754, allows the Secretary to issue such regulations and orders as the Secretary considers necessary to carry out the purposes and requirements of the PPA.

147.    The Final Rule requires the designation of the entire state of Idaho as quarantined unless Idaho adopts and enforces APHIS's regulations on the intrastate movements of the regulated articles.

148.    The Final Rule violates the Tenth Amendment because it coerces the state of Idaho to adopt and enforce APHIS's regulatory program.

149.    APHIS's coercion of the state of Idaho is arbitrary and capricious, an abuse of discretion, otherwise not in accordance with law, in violation of the APA and the United States Constitution, and entitles Plaintiffs to the relief requested below.

## ATTORNEYS' FEES

150.    Under 28 U.S.C. § 2412 and other applicable law, Plaintiffs are entitled to recover their costs and attorneys' fees incurred in bringing this action against APHIS.  Under Idaho Code § 12-117, and other applicable Idaho State law, Plaintiffs are entitled to recover their costs and attorneys' fees incurred in bringing this action against ISDA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment providing the following relief:

1.    Declare that APHIS violated the PPA, APA, NEPA, FACA, and the Tenth Amendment;

2.    Declare that APHIS's actions, as set forth above, were arbitrary and capricious, an abuse of discretion, not in accordance with law, and without observance of procedures required by law;

3.    Declare that ISDA's actions, as set forth above, were arbitrary and capricious, an abuse of discretion, in excess of the statutory authority of the agency, and not in accordance with law;

4.    Vacate and set aside the Final Rule, APHIS's ad hoc protocols, and the Idaho PCN Rules;

5.    Enjoin APHIS and ISDA from relying on or enforcing the Final Rule, APHIS's ad hoc protocols, the Canada and United States Guidelines, the advice recommendation or reports of the Technical Working Group, or the Idaho PCN Rules;

6.    Enjoin and immediately end the quarantine and regulation of all fields owned or farmed by Plaintiffs;

7.      Award Plaintiffs their attorneys' fees and costs incurred in bringing and

maintaining this action pursuant to 28 U.S.C. § 2412, Idaho Code § 12-117, and other applicable

authorities; and

8.      Grant Plaintiffs such other and further relief as the Court may deem necessary and

appropriate.

DATED this 28th day of April, 2015.

HOLLAND & HART LLP


By:    */s/ Walter H. Bithell*_____
       Walter H. Bithell, of the firm
       Attorneys for Plaintiffs

7704554_4