UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MICKELSEN FARMS, LLC, et al., | Case No. 1:15-cv-00143-EJL-CWD |
| Plaintiffs, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| ANIMAL AND PLANT HEALTH INSPECTION SERVICES, et al., | |
| Defendants. | |

Before the Court in the above entitled matter are cross Motions for Summary Judgment filed by the parties in this action. (Dkt. 75, 84.) The Motions have been fully briefed and are ripe for the Court's consideration. Having reviewed the record herein, the Court finds the facts and legal arguments are adequately presented in the briefs and record. Accordingly, in the interest of avoiding further delay, and because the Court conclusively finds that the decisional process would not be significantly aided by oral argument, the Motions shall be decided on the record before this Court without oral argument.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs are a number of entities and individuals who farm potatoes in southeastern

Idaho. In April of 2006, Pale Cyst Nematode (PCN), *Globodera Pallida*,[1] was detected in the soil of a number of fields that raised potato crops in eastern Idaho. As a result, the Animal and Plant Health Inspection Services (APHIS)[2] published an Interim Rule and later adopted a Final Rule which provided regulations for the designation and quarantining of fields in Idaho as well as Deregulation Protocols. The Idaho State Department of Agriculture (ISDA) adopted rules and procedures that parallel APHIS's and assisted APHIS in implementing its Interim and Final Rules.

The Plaintiffs filed this action against the federal and state Defendants challenging the issuance and implementation of the Interim Rule and Final Rule. (Dkt. 1.)[3] Specifically, Plaintiffs claim the federal Defendants violated the Administrative Procedure Act (APA), 5 U.S.C. §§ 553, 701-706; the Plant Protection Act (PPA), 7 U.S.C. §§ 7701 and 7786; the Federal Advisory Committee Act (FACA), 5 U.S.C. App. II, §§ 1-16; the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-70; and the Tenth Amendment of the United States Constitution. As to the state Defendants, the Plaintiffs claimed the ISDA failed to comply with its legal obligations under the Idaho Plant Pest Act

---

[1] PCN is a pest of potato crops which can reduce the potato yields through root damage but poses no threat to human health.

[2] APHIS is a federal agency within the United States Department of Agriculture responsible for ensuring compliance with the federal statutes raised in this action.

[3] The named federal Defendants include APHIS; Kevin Shea, the Administrator of APHIS; Brian Marschman, the Idaho Plant Health Director for APHIS; Tina Gresham, Director of PCN Program for APHIS; and Tom Vilsack, the United States Secretary of Agriculture. The named state Defendants are ISDA and Celia R. Gould, the Director of ISDA. All of the individually named persons are being sued in their official capacities.

(Idaho PPA), Idaho Code §§ 22-2001 to 22-2023; the Idaho Administrative Procedures Act (Idaho APA), Idaho Code §§ 67-5101 to 67-5292; and Idaho's Rules Governing the PCN (Idaho PCN Rules), IDAPA 02.06.10. In general, Plaintiffs claim the state and federal Defendants' actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

The Court previously granted the state Defendants' Motion to Dismiss. (Dkt. 35.) The Parties have also filed a Stipulation for Voluntary Dismissal of the action as brought by Plaintiffs Gerald and Helen Kelley, Craig V. and Andrea Kelly, Dan G. and Karen K. Eldredge, and Bohemian, LLC. (Dkt. 47.) The Plaintiffs and federal Defendants have now filed their cross Motions for Summary Judgment as to the remaining claims which the Court takes up herein. (Dkt. 75, 84.)

## STANDARD OF LAW

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure which provides, in pertinent part, that judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Under Rule 56, summary judgment is mandated if the non-moving party fails to make a showing sufficient to establish the existence of an element which is essential to the non-moving party's case and upon which the non-moving party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the non-moving

party fails to make such a showing, "there can be no 'genuine issue of material fact,' since a complete[] failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.

> In order to withstand a motion for summary judgment, a party
>
> (1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible.

*British Motor Car Distrib. v. San Francisco Auto. Indus. Welfare Fund*, 883 F.2d 371, 374 (9th Cir. 1989) (citation omitted). When applying this standard, the court views all of the evidence in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Hughes v. United States*, 953 F.2d 531, 541 (9th Cir. 1992).

## STATUTORY FRAMEWORK

The Plant Protection Act (PPA) authorizes the Secretary of the United States Department of Agriculture (USDA) to adopt and/or issue regulations "to prevent the introduction of plant pests into the United States or the dissemination of plant pests within the United States." 7 U.S.C. §§ 7711(a), 7712(c). The Secretary delegated that authority to APHIS, making APHIS responsible for the regulation and containment of PCN. 7 C.F.R. § 2.22(a). Under that authority, APHIS issued the Interim and Final Rules which quarantined certain infested fields and associated fields in Idaho where PCN was found, restricts the interstate movement of regulated articles from those quarantined areas, and provides Deregulation Protocols for quarantined fields. *See* 7 C.F.R. § 301.86; (RM 1,

438.) The claims against the federal Defendants in this case allege violations of the APA, PPA, FACA, NEPA, and the Tenth Amendment relating to their actions taken under the PPA.

**DISCUSSION**

## 1. Violation of the APA's Rulemaking Requirements

Plaintiffs argue APHIS violated the APA's rulemaking requirements with regard to the Deregulation Protocols, 7 C.F.R. §§ 301.86-3(d)(1) & (2), because APHIS never issued the protocol contemplated in the Final Rule to deregulate infested fields and the multiple iterations of the protocols for deregulating associated fields were never subject to public notice or comment. (Dkt. 75 at 12-14) (Dkt. 87 at 6-7.)[4] Defendants counter arguing the Deregulation Protocols were not subject to the rulemaking requirements and, therefore, did not violate the APA. (Dkt. 84 at 14) (Dkt. 89 at 5.)

The APA establishes the notice and comment procedures federal administrative

---

[4] In their Complaint, Plaintiffs raise three APA claims. The first two claims allege APHIS violated the PPA and the APA's rulemaking requirements by failing to comply with the notice and comment procedures when it 1) issued the Final Rule and 2) adopted "ad hoc protocols" for deregulation of infested and associated fields. (Dkt. 1 at ¶¶ 99-113) (Dkt. 75 at 9-16.) The third claim alleges APHIS's application of the Final Rule and its "ad hoc protocols" is arbitrary, capricious, an abuse of discretion, and not in accordance with law. (Dkt. 1 at ¶¶ 114-118.) On summary judgment, Plaintiffs have pursued only their claim that the Deregulation Protocols violated the PPA and APA's rulemaking requirements. (Dkt. 75 at 9-22) (Dkt. 84 at 14-15, n.6) (Dkt. 87 at 6-11.) As such, Plaintiffs have abandoned their other claims by failing to raise them in their summary judgment motion. *Jenkins v. Cnty. of Riverside*, 398 F.3d 1093, 1095 n. 4 (9th Cir. 2005) ("Jenkins abandoned her other two claims by not raising them in opposition to the County's motion for summary judgment."); *USA Petroleum Co. v. Atl. Richfield Co.*, 13 F.3d 1276, 1284 (9th Cir. 1994) ("It is a general rule that a party cannot revisit theories that it raises but abandons at summary judgment."). In this Order, the Court addresses only that which Plaintiffs have pursued and argued in their summary judgment briefing. The other claims and arguments are waived.

agencies must use when engaged in "rulemaking," which is defined as the process of "formulating, amending, or repealing a rule." *Perez v. Mortgage Bankers Ass'n*, 135 S.Ct. 1199, 1203-04 (2015); *see also Hemp Industries Ass'n v. Drug Enforcement Admin.*, 333 F.3d 1082, 1087-88 (9th Cir. 2003); 5 U.S.C. §§ 551(5), 553. Those procedures generally require agencies to: (1) publish a notice of the proposed rule in the Federal Register; (2) provide a period for interested persons to comment on the proposed rule, which will be considered by the agency prior to adopting the rule; and (3) publication of the final rule in the Federal Register. 5 U.S.C. § 553; *see also Mora-Meraz v. Thomas*, 601 F.3d 933, 939 (9th Cir. 2010).

There are two types of rules under the APA: legislative rules and interpretive rules. *Perez*, 135 S.Ct. at 1203. The rulemaking procedures only apply to legislative rules, not interpretative rules. If a rule is "legislative," the agency must use the notice and comment procedure unless "it publishes a specific finding of good cause documenting why such procedures 'are impracticable, unnecessary, or contrary to the public interest.'" *Hemp Indus.*, 333 F.3d at 1087 (quoting 5 U.S.C. § 553(b)(B)). On the other hand, "interpretive rules, general statements of policy, or rules of agency organization, procedure or practice" are exempt from the rulemaking procedures. 5 U.S.C. § 553(b)(3)(A); *Mora-Meraz*, 601 F.3d at 939.[5] The exceptions to the notice and comment requirements are "narrowly

---

[5] The APA notice and comment requirements do not, however, apply:

> (A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or (B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or

construed and only reluctantly countenanced." *Alcaraz v. Block*, 746 F.2d 593, 612 (9th Cir. 1984). Failure to implement the notice and comment procedure when required, invalidates the resulting regulation. *See Paulsen v. Daniels*, 413 F.3d 999, 1008 (9th Cir. 2005).

Plaintiffs assert the Deregulation Protocols are legislative rules subject to the APA's rulemaking procedural requirements. (Dkt. 87 at 6-7.) Defendants argue the protocols are not legislative rules but, instead, general policy statements and, therefore, excluded from the APA's rulemaking procedures (Dkt. 89 at 5.)[6]

### A.     Legislative Rules

Legislative rules "create rights, impose obligations, or effect a change in existing law pursuant to authority delegated by Congress." *Hemp Indus.*, 333 F.3d at 1087 (internal citation omitted). Legislative rules trigger the notice and comment process because they have the "force and effect of law." *Perez*, 135 S.Ct. at 1203 (citing *Chrysler Corp. v. Brown*, 441 U.S. 281, 302–303 (1979)); *see also Erringer v. Thompson*, 371 F.3d 625, 630 (9th Cir. 2004). A rule has the force and effect of law:

(1)     when, in the absence of the rule, there would not be an adequate legislative basis for enforcement action;

(2)     when the agency has explicitly invoked its general legislative authority; or

(3)     when the rule effectively amends a prior legislative rule.

---

contrary to the public interest.
5 U.S.C. § 553(b)(A) & (B).

[6] Defendants have not argued the Deregulation Protocols are interpretive rules, rules of agency organization, or are excused for good cause. Therefore, the Court has not addressed those exceptions.

*Hemp Indus.*, 333 F.3d at 1087(internal quotation marks and citation omitted). "If the answer to any of these questions is affirmative," the rule is legislative, not interpretive. *Oregon v. Ashcroft*, 368 F.3d 1118, 1133 (9th Cir. 2004) (internal quotation marks and citation omitted), *aff'd sub nom. Gonzales v. Oregon*, 546 U.S. 243 (2006).

Interpretive rules, on the other hand, "merely explain, but do not add to, the substantive law that already exists in the form of a statute or legislative rule." *Hemp Indus.*, 333 F.3d at 1087 (internal citation omitted). The "critical feature" of interpretive rules "is that they are 'issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers.'" *Perez*, 135 S.Ct. at 1204 (quoting *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995)). Interpretive rules do not require notice and comment rulemaking, and "do not have the force and effect of law." *Id.* (quoting *Chrysler Corp.*, 441 U.S. at 302-03).

The Deregulation Protocol at issue in this case is a legislative rule. The Interim Rule itself states that it "amends" the existing Domestic Quarantine Notices regulation "by adding a new subpart regulating PCN" pursuant to APHIS's authority under the PPA. (RM 444-45.) The Deregulation Protocol, therefore, has the force and effect of law because it changes existing law by adding new substantive requirements for the quarantining and deregulating of PCN infested and associated fields to be implemented by APHIS pursuant to its authority under the PPA. *See e.g. Record Buck Farms, Inc. v. Johanns*, 510 F.Supp.2d 868 (M.D. FL 2007) (Parties did not contest that a similar amendment to the domestic quarantine notices regulation, 7 C.F.R. § 301.75, was a legislative rule but, instead,

disputing whether the good cause exception to the rulemaking requirement applied.). Contrary to the Defendants' argument, the Deregulation Protocols do not merely explain APHIS's interpretation of the PPA but, instead, are themselves the rules governing APHIS's implementation of the PPA with regard to PCN. The fact that the regulations leave final approval of the protocol to the Administrator does not make the regulations any less binding on those who are obligated to follow the protocol. *See Nat. Mining Ass'n v. McCarthy*, 758 F.3d 243, 251-51 (D.C. Cri. 2014) ("An agency action that purports to impose legally binding obligations or prohibitions on regulated parties—and that would be the basis for an enforcement action for violations of those obligations or requirements—is a legislative rule. An agency action that sets forth legally binding requirements for a private party to obtain a permit or license is a legislative rule.")).

As a legislative rule, APHIS was required to satisfy the APA's rulemaking notice and comment requirements that it provide: 1) publication of notice of the proposed rule, 2) a period for interested individuals to comment on the proposed rule, and 3) publication of the adopted rule not less than thirty days before its effective date. 5 U.S.C. §§ 533(b), (c), (d); *Paulsen*, 413 F.3d at 1008. Defendants have not asserted nor shown that they satisfied the notice and comment process. Therefore, summary judgment is granted in favor of Plaintiffs on this claim.

## B.    General Policy Statements

To qualify for the "statement of policy" exception to formal rulemaking, two requirements must be satisfied: (1) the policy "must operate only prospectively," and (2)

the policy "must not establish a binding norm, or be finally determinative of the issues or rights to which [it is] addressed, but must instead leave officials free to consider the individual facts in the various cases that arise." *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1013-14 (9th Cir. 1987).

On the first factor, the parties appear to agree that the protocols are prospective. (Dkt. 87 at 7) (Dkt. 89 at 7.) The Court concurs. The Deregulation Protocols set forth the process APHIS will apply in order to contain PCN and operate prospectively by informing the public of the areas to be quarantined, how APHIS will regulate and deregulate PCN infested and associated fields in Idaho, and establish restrictions on the interstate movement of regulated articles from the quarantined area. (RM 1, 438.)

Turning to the second factor - whether the deregulation protocol is binding/finally determinative or is instead discretionary – the parties are in disagreement. "The critical factor to determine whether a directive announcing a new policy constitutes a rule or a general statement of policy is the extent to which the challenged [directive] leaves the agency, or its implementing official, free to exercise discretion to follow, or not to follow, the [announced] policy in an individual case." *Mada-Luna*, 813 F.2d at 1013 (internal quotation marks and citation omitted). "To the extent that the directive merely provides guidance to agency officials in exercising their discretionary powers while preserving their flexibility and their opportunity to make 'individualized determination[s],' it constitutes a general statement of policy." *Id.* "In contrast, to the extent that the directive 'narrowly limits administrative discretion' or establishes a 'binding norm' that 'so fills out the

statutory scheme that upon application one need only determine whether a given case is within the rule's criterion,' it effectively replaces agency discretion with a new 'binding rule of substantive law.' In these cases, notice-and-comment rulemaking proceedings are required, as they would be for any other substantive rule, and they will represent the only opportunity for parties to challenge the policy determinations upon which the new rule is based." *Id.*

There is no dispute that the Deregulation Protocols are written in mandatory language. (Dkt. 84 at 21.) Despite that mandatory language, Defendants argue the protocols are not binding nor finally determinative; pointing to examples of APHIS's emails with individual farmers where it considered whether particular fields would be deregulated. (Dkt. 84 at 21-22.) The Court disagrees.

The mandatory language of the Deregulation Protocols is binding on APHIS and finally determinative of whether a field will be deregulated. *See Mada-Luna*, 813 F.2d at 1014. Under the protocols, the removal of a field from quarantine is dependent on whether the field has been found to be free of PCN and meets the applicable quarantine protocol approved by the Administrator as sufficient to support removal of the field from quarantine. 7 C.F.R. § 301.86-3(d). The specific protocols to be approved is left to the Administrator and those protocols have evolved over time, but the Deregulation Protocol's mandatory language remains final and binding on APHIS. (DEREG 800-02.) That the Administrator has periodically changed the Deregulation Protocols, in part, in response to feedback from the public does not eliminate the fact that APHIS may not remove a field from quarantine

unless the field has satisfied the applicable protocol and been found to be free of PCN. *See* 7 C.F.R. § 301.86-3(d).

The examples pointed to by Defendants do not show the Deregulations Protocols are discretionary. The emails and communications between APHIS and individual farmers identified in the Administrative Record by Defendants instead had to do with whether the particular fields were properly subject to quarantine/regulation in the first instance; not whether they had satisfied the Deregulation Protocol and should be removed from quarantine. (DEREG 437-509) (DEREG 1467-68.) Those examples, therefore, do not show the protocols are discretionary because APHIS's decisions with regard to those fields were based on its application of the regulations to those fields, not any discretionary action on the part of APHIS.

For these reasons, the Court concludes the Deregulation Protocols are not general statements of policy. They are instead legislative rules subject to the APA's rulemaking notice and comment requirements. Accordingly, the Court grants the Plaintiffs' summary judgment on this claim.

**2.      Violation of the Federal Advisory Committee Act**

The Fourth Claim for Relief alleges APHIS violated FACA and the APA when it established and utilized the Technical Working Group (TWG) as an advisory committee. (Dkt. 1 at ¶¶ 119-127.) Defendants argue TWG is not subject to FACA because APHIS never established or utilized the group as a federal advisory committee under the statute. (Dkt. 84 at 8.) Plaintiffs maintain the opposite is true. (Dkt. 75 at 3-7) (Dkt. 87 at 1-5.)

FACA imposes a number of procedural requirements on "federal advisory committees," which are defined to include "any committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof...which is...established or utilized by one or more agencies,…in the interest of obtaining advice or recommendations for…one or more agencies or officers of the Federal Government...." 5 U.S.C. App. II, § 3(2). Although this definition of an "advisory committee" is broad, the Supreme Court has cautioned that FACA was "not intended to cover every formal and informal consultation between ... an Executive agency and a group rendering advice." *Public Citizen v. United States Dep't of Justice*, 491 U.S. 440, 452 n. 8 (1989). Instead, the "Supreme Court has given a narrow interpretation to the words 'established' and 'utilized.'" *Idaho Wool Growers Ass'n v. Schafer*, 637 F.Supp.2d 868, 878 (D. Idaho 2009) (citing *Heartwood, Inc. v. United States Forest Serv.*, 431 F.Supp.2d 28, 34 (D.D.C. 2006) (quoting *Public Citizen*, 491 U.S. at 457–58)).

"A federal advisory committee is 'established' by the federal government when a federal government entity forms an advisory committee for the purpose of obtaining advice or recommendations from that committee." *Washington Toxics Coal. v. United States E.P.A.*, 357 F.Supp.2d 1266, 1271 (W.D.Wa. 2004) (citing *Aluminum Co. of Am. v. Nat'l Marine Fisheries Serv.*, 92 F.3d 902, 905 (9th Cir. 1996); *Food Chem. News v. Young*, 900 F.2d 328, 332–33 (D.C. Cir. 1990)). A committee is "utilized" when a federal agency exercises "strict 'management or control" over an advisory committee. *Id.* (quoting *Public Citizen*, 491 U.S. at 440, 457–58). In determining if a committed is "utilized" courts inquire

as to "whether the committee in question is 'purely private,' whether it accepted any public funds, whether federal agencies or officials 'actually' managed or controlled the committee, and whether it was formed 'for the explicit purpose of furnishing advice to the Government.'" *Id.* (quoting *Public Citizen*, 491 U.S. at 460; *Aluminum Co. of Am.*, 92 F.3d at 906).

The Ninth Circuit has further refined the definition of a FACA "advisory committee" as "a formal group of a limited number of private citizens who are brought together to give publicized advice as a group." *Aluminum Co. of Am.*, 92 F.3d at 906 (quoting *Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 915 (D.C. Cir. 1993) (The committee must "render advice or recommendations [ ] as a group, and not as a collection of individuals.").

Defendants maintain that TWG is not a federal advisory committee under FACA because APHIS never established the group for purposes of the statute. (Dkt. 84 at 8.) Defendants argue TWG is instead an ad hoc group of subject matter experts who meet periodically to provide scientific and technical information in response to technical questions posed to it by the agency but whose recommendations are not binding on the agency. (Dkt. 84 at 10.) Defendants distinguish TWG from an advisory committee by arguing its members do not provide advice as a group but, instead, provide feedback on an individual basis. (Dkt. 84 at 11-12.)

There is no real dispute that TWG was "established" by Defendants. In its Answer to the Complaint in this case, Defendants admit that "APHIS has employed a [TWG] to

help inform its formulation of PCN policy, procedures, and regulations" and "some advice and recommendations from [TWG] formed the basis of APHIS's PCN regulatory program." (Dkt. 37 at ¶¶ 64, 66.) In its summary judgment briefing, APHIS states that it "periodically convened" a TWG "to provide the agency with technical information and strategy opinions for preventing the spread of PCN" which APHIS regulatory officials used to make program policy decisions. (Dkt. 84 at 7-8.) The Administrative Record further supports the conclusion that TWG was convened by APHIS. (FACA 619, 622.)

The Court next considers TWG's make up as a group. "[A]n important factor in determining the presence of an advisory committee [is] the formality and structure of the group." *Ass'n of Am. Physicians & Surgeons*, 997 F.2d at 913-14. In determining whether the group in question has sufficient formality and structure to qualify as a FACA advisory committee courts consider whether the group has 1) an organized structure, 2) a fixed membership, and 3) a specific purpose. *Id.* at 914. In this case, the Court disagrees with Defendants' characterization of TWG as an ad hoc collection of persons who gave individual feedback.[7] *See Id.* at 913 (citing cases) (The Court does not defer to the agency's

---

[7] The Administrative Record contains conflicting emails among APHIS employees concerning whether TWG is an advisory board. (FACA 3, 642-51.) In one exchange, an APHIS administrator concluded their "technical working groups" are advisory boards that should be reported but another director, Russ Bulluck, disagreed. (FACA 642-51.) In a later email, Mr. Bulluck, who was involved with TWG in question here, concluded the agency's technical working groups do not meet the definition of an advisory committee because it plays no direct role in the forming of policy or making regulatory decisions. (FACA 3.) The Court finds the Defendants' position that TWG is not an advisory committee because it made no policy or regulatory decisions is inconsistent with case law: "Advisory panels that support decision makers with data, and not policy advice or recommendations, can be considered advisory committees under the FACA." *Heartwood, Inc. v. United States Forest Serv.*, 431 F.Supp.2d 28, 34 (D.D.C. 2006) (citing cases).

construction of FACA or its determination as to whether a group or committee is subject to FACA.). This case is distinct from the cases cited by Defendants, *Aluminum Co. of Am. v. Nat. Marine Fisheries Serv.*, 92 F.3d 902 (9th Cir. 1996) and *Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 914 (D.C. Cir. 1993), because TWG is not a privately formed entity designed to present the various entities' individual positions. The documents in the Administrative Record instead show that TWG was formed at the prompting of APHIS to meet periodically for the specific purpose of advising and presenting the group's recommendations regarding the PCN Program to APHIS and addressing specific questions posed to it by the agency.

TWG was a conglomeration of individuals brought together by APHIS as a formal group to give recommendations to the agency concerning the PCN Program. TWG members meet either in person, email, or by phone at various times in 2006-2008 and again in 2011 and 2012. (FACA 575, 619-23, 760, 770, 776, 780, 796, 817, 888.) Participants of TWG included individuals from the USDA, ISDA, APHIS, University of Idaho (UI), Oregon State University (OSU), Scottish Agricultural Science Agency (SASA), Cornell University, and Rothamsted Research. (FACA 38, 791, 803, 817, 834.) There has been both some consistency and some variations in the participants of TWG over the years. (FACA 23-27.) Six individuals have participated in every TWG that has been held: Russ Bulluck (APHIS), Russ Ingham (OSU), Dan Kepich (APHIS), Jon Pickup (SASA), Xiaohong Wang (Cornell University), and Ken Evans (Rothamsted Research). In addition, six entities participated in both the 2006 and 2012 TWG meetings, although some of the

individuals who represented those entities changed. (FACA 38, 892.) The Court finds TWG had sufficient formality and structure as a group to constitute an advisory committee.

Finally, the Court finds the materials in the Administrative Record demonstrate that TWG was "utilized" by the agency. The Administrative Record establishes that TWG was formed for the purpose of providing recommendations to the agency and those recommendations were presented as the consensus of advice from the group collectively to the agency. *See Ass'n of Am. Physicians & Surgeons*, 997 F.2d at 915 (The committee must "render advice or recommendations [ ] as a group, and not as a collection of individuals.").[8] The Final Minutes of TWG's May 10-11, 2006 meeting state the "purpose of the PCN TWG is to provide science-based recommendations to the PCN program." (FACA 834.) A December 11, 2006 virtual meeting was held "to catalogue all possible tools and strategies relating to eradication of *Globodera pallida* (PCN) in Idaho" based on certain assumptions and to "further define technical suggestions and guidance to eradicate PCN in Idaho…and to finalize and present the information to the [National Potato] Council later in the week of the NPC meeting." (FACA 817.) Similarly, the objective of TWG's January 2007 Eradication Plan Recommendations Meeting was to "[p]rovide scientific recommendations for a plan that will eradicate *G. pallida* from known infested fields in the

---

[8] There are materials in the Administrative Record of isolated times when members from TWG provided individual feedback. In 2009, members from TWG provided a progress report of the team's work over the last year entitled Technical Assistance to the Eradication of PCN (*Globodera pallida*) in the State of Idaho: a Multi-institutional Approach. (FACA 626.) In that report, individual members provided summaries from each individual group's work on the subject. On whole, however, the recommendations made by TWG were made as a collective group.

regulated area within Idaho." (FACA 796.)

In June of 2007, the USDA presented the PCN Eradication Plan for infested fields in Idaho "based on the recommendations of [TWG]" with some changes due to logistics, resources, and pragmatics. (FACA 787.) TWG met again on July 30, 2007 and made draft, final, and updated recommendations which were distributed via email. (FACA 771-73.)

On February 28, 2012, TWG held a virtual meeting called by the USDA as part of the five year review to provide a "technical review of the Idaho PCN program." (FACA 29.) The Final Report from that meeting, made on USDA letterhead, states:

> The purpose of this TWG is to answer the questions provided by the National PCN Program, evaluate the information derived from the bioassays if available, and finally to provide recommendations for the PCN Program based on the most current scientific information available. The TWG does not make decisions, but instead provides direction based on a series of questions and the responses provided. The final report will be provided to the National PCN Program and will feed into the 5 year review, occurring at the end of March, 2012.

(FACA 31-32.)[9] The report then goes on to again provide TWG's recommendations for the program. (FACA 36.)

For the reasons stated above, the Court concludes that TWG was a formal FACA advisory committee established and utilized by APHIS. As such, Defendants were required

---

[9] Defendants dispute the characterization of this document as a "Final Report" arguing it is a report prepared by TWG Chair based on input from TWG but "in no way represents a consensus view of the TWG." (Dkt. 84 at 12, n. 5.) The Court disagrees. The footer on the Document itself entitles the document "Final Report." (FACA 29.) Further, the contents of the document are presented as the collective summary of TWG's "recommendations" to the PCN Program; not the individual perspectives of TWG's members. (FACA 29, 36.) There is nothing about this document expressing anything other than the unified recommendations of TWG.

to comply with FACA's procedural requirements. There is no evidence presented that Defendants have satisfied FACA. Therefore, the Court grants Plaintiffs' Motion for Summary Judgment on this claim.

## 3.     Violation of NEPA – Failure to Prepare NEPA Review

Plaintiffs' Fifth Claim for Relief alleges Defendants' actions violated NEPA and the APA by failing to take the requisite hard look at the environmental impacts of its fumigation program and its categorical exclusion of program changes and otherwise acted arbitrarily, capriciously, and not in accordance with the law. (Dkt. 1 at ¶¶ 128-136.) Specifically, Plaintiffs allege in the Environmental Assessments (EAs) issued in 2007 (collectively "the 2007 EAs") the Defendants failed to comply with NEPA's evaluation procedures for major federal actions that may have significant environmental effects; failed to consider the potential for significant environmental effects; took actions outside the scope of the NEPA documents; failed to supplement the 2007 EAs when substantial changes in its use of Methyl Bromide occurred, significant new circumstances arose, and new information became available; failed to insure the scientific integrity of its NEPA analysis; and failed to obtain special expertise of other federal agencies.[10] Defendants argue the NEPA claim is moot because a Finding of No Significant Impact and Supplemental EA (2017 FONSI/SEA) was issued in 2017 after the Complaint in this case was filed which supersedes the 2007 EAs and FONSI challenged in this case. (Dkt. 1, 84.)

---

[10]  APHIS issued EAs in June of 2004 and May of 2007; an amended EA in July of 2007; a FONSI in August 2007; and an addendum to the 2007 FONSI all of which addressed, among other things, the use of Methyl Bromide to eradicate PCN in Idaho. (Dkt. 1 at ¶¶ 91-98) (Dkt. 84-2 at 2-3.)

Alternatively, Defendants assert they have complied with NEPA's demands. (Dkt. 84.) Plaintiffs argue their claim is not moot and the Court can adjudicate APHIS's liability under NEPA or, alternatively, that an exception to mootness applies. (Dkt. 87 at 11-17.) Further, Plaintiffs maintain the Court should declare that APHIS violated NEPA both in the 2007 EAs as well the 2017 FONSI/SEA which, they argue, did not rectify the violations of the prior EAs. (Dkt. 87.)

A.    **Mootness Doctrine**

Taking up the jurisdictional issue first, Defendants argue the Plaintiffs' NEPA claim is moot because on May 3, 2017 the agency issued the 2017 FONSI/SEA which supersedes the 2007 EAs upon which Plaintiffs' NEPA claim is based. (Dkt. 89 at 9.) Plaintiffs argue their NEPA claims are not moot because they present a live controversy as to the validity of the 2007 EAs and because they seek declaratory relief stating that all of the EAs violate NEPA. (Dkt. 87 at 12-14.)

A federal court's jurisdiction is limited to actual, live cases or controversies. U.S. CONST. ART. III § 2, CL. 1. "The doctrine of mootness, which is embedded in Article III's case or controversy requirement, requires that an actual, ongoing controversy exist at all stages of federal court proceedings." *Grand Canyon Trust v. United States Bureau of Rec.*, 691 F.3d 1008, 1016-17 (9th Cir. 2012), as amended (Sept. 17, 2012) (quoting *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1086 (9th Cir. 2011)). "A claim is moot if it has lost its character as a present, live controversy." *Id.* (quoting *Am. Rivers v. Nat'l Marine Fisheries Serv.*, 126 F.3d 1118, 1123 (9th Cir. 1997)). "If an event occurs that prevents the

court from granting effective relief, the claim is moot and must be dismissed." *Id.* Nonetheless, "completion of activity is not the hallmark of mootness." *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1065 (9th Cir. 2002). "[T]he question is not whether the precise relief sought at the time [the action] was filed is still available," but, instead, "whether there can be *any* effective relief." *Nw. Envtl. Def. Ctr. v. Gordon*, 849 F.2d 1241, 1244–45 (9th Cir. 1988) (citations omitted) (emphasis in original). The party asserting mootness has a heavy burden to show that the Court cannot provide an effective remedy. *Forest Guardians v. Johanns*, 450 F.3d 455, 461 (9th Cir. 2006).

The Ninth Circuit has recognized that "the issuance of a superseding BiOp moots issues on appeal relating to the preceding BiOp." *Grand Canyon*, 691 F.3d at 1017 (citing and discussing cases). The same is true here. Plaintiffs do not dispute that the 2017 FONSI/SEA supersedes the 2007 EAs. Because the 2007 EAs have been superseded, they are no longer the operative documents governing the claims raised by Plaintiffs' in this action. Further, Plaintiffs have sufficient time to challenge the 2017 FONSI/SEA. *See Am. Rivers*, 126 F.3d at 1123–24 (finding case moot because biological opinion had been superseded by a newer biological opinion that would not expire for three years, thereby providing sufficient time to challenge new biological opinion). Therefore, the claims based on the 2007 EAs are moot because there is no live controversy nor any effective relief the Court can provide with regard to any NEPA violations in the 2007 EAs.

### B. Exception to Mootness Doctrine

Plaintiffs argue an exception to the mootness doctrine allows the case to proceed;

namely, the "voluntary cessation" exception. (Dkt. 87 at 16.) Defendants contend the exception does not apply here because APHIS did not issue the 2017 FONSI/SEA to avoid judgment and there is no reasonable expectation of a recurrence. (Dkt. 89 at 9-10.)

The voluntary cessation exception applies "if the defendant voluntarily stops the allegedly illegal conduct to avoid a judgment against him, unless it is 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Forest Guardians v. United States Forest Serv.*, 329 F.3d 1089, 1095 (9th Cir. 2003) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189 (2000)). Voluntary cessation, however, does not render a challenge to the alleged unlawful conduct moot unless the defendant can show (1) "it can be said with assurance that there is no reasonable expectation...that the alleged violation will recur," and (2) "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *United States v. Brandau*, 578 F.3d 1064, 1068 (9th Cir. 2009).

This is a "stringent" standard, and the party claiming mootness has the "'heavy burden of persuad[ing]' the court that the challenged conduct cannot reasonably be expected to start up again." *Laidlaw Envtl. Servs.*, 528 U.S. at 189 (quoting *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968)). The timing of the voluntary cessation is a factor in considering the defendant's motivation for voluntarily ceasing the challenged action. *Native Vill. of Noatak v. Blatchford*, 38 F.3d 1505, 1511 (9th Cir. 1994).

Courts have considered at least three factors to determine whether there is a

reasonable expectation that the wrong will be repeated. *See Envtl. Prot. Info. Ctr. v. United States Forest Serv.*, No. C-02-2708 JCS, 2006 WL 2130905, at *5 (N.D. Cal. July 28, 2006). First, "whether the defendant has shown that a change was the result of serious deliberation and was made for convincing reasons (other than the desire to avoid litigation)." *Id.*; *see also Armster v. United States Dist. Court for the Cent. Dist. of Cal.*, 806 F.2d 1347, 1359 (9th Cir. 1986) (finding defendant's concession that conduct was illegal more likely to establish mootness). Second, "the extent to which the defendant has committed not to engage in the challenged practice in the future and the degree to which any promises made are likely to be binding." *Id.* And third, "whether the cessation is based on external circumstances that have made a recurrence of the challenged conduct impossible or impractical." *Id.*; *see also Forest Serv. Employees for Envtl. Ethics v. United States Forest Serv.*, 408 F. Supp. 2d 916, 918–19 (N.D. Cal. 2006) (reasoning that the economic circumstances made the challenged conduct unlikely to recur).

As to the first factor, the Administrative Record in this case establishes that Defendants did not issue the 2017 FONSI/SEA to avoid this litigation and that there is no reasonable expectation that the alleged violations in the 2007 EAs would reoccur. APHIS discussed issuing a supplemental EA in 2012 and 2014, before this case was filed, to address, at least in part, the lower use rates of Methyl Bromide than what was analyzed in the 2007 EAs. (NEPA 14, 90) (Dkt. 84-2 at 6.) The 2017 FONSI/SEA itself states one of its purposes is to "include updated information regarding current eradication program practices and activities" and notes the program no longer uses Methyl Bromide and the

impacts of that change. (Dkt. 84-2 at 3.)

Where a governmental official or agency has discontinued a challenged practice, as opposed to a private actor, there is a presumption that the cessation is in good faith and a proper discharge of governmental duties. *See Rio Grande Silvery Minnow v. Bureau of Rec.*, 601 F.3d 1096, 1116 (10th Cir. 2010). In such cases, a governmental defendant has a lighter burden in proving the challenged conduct will not reoccur once the claims are dismissed as moot. *See Citizens for Responsibility and Ethics in Washington v. S.E.C.*, 858 F.Supp.2d 51, 61 (D.D.C. May 2, 2012); *Gutierrez v. Kerry*, 2016 WL 7742793, at * 9 (S.D.T.X. March 10, 2016).

As to the second and third factors, here the 2017 FONSI/SEA completely supersedes the 2007 EAs. Therefore the 2007 EAs are no longer the operative document for the PCN eradication protocol in Idaho and there is no reasonable expectation that the 2007 EAs will be reinstated or the alleged violations contained therein will reoccur. *See Brandau*, 578 F.3d at 1068. The Court disagrees with Plaintiffs' argument that the NEPA violations they have alleged will "resurface" and are likely to reoccur because the 2017FONSI/SEA is a programmatic document to which subsequent site-specific EAs could be tiered to in the future. (Dkt. 87 at 17.) The 2017 FONSI/SEA states Methyl Bromide is no longer being used or considered for use under the preferred alternative due to public concerns and if the agency were to propose its use in the future, a separate EA would be issued. (Dkt. 84-2 at 3.) Again, the Court presumes government agencies will undertake their official duties in accordance with the law and, as applicable here, will comply with NEPA's demands in

future decisionmaking. Granting the declaratory relief Plaintiffs request as to possible future agency actions, including the possibility of future tiering, would be speculative and is outside the Court's authority. *See Florida Medical Ass'n, Inc. v. Dept. of Health, Educ., & Welfare*, 947 F.Supp.2d 1325, 1354 (M.D.F.L. 2013) ("[W]hile the APA authorizes a court to enjoin a specific final agency decision it finds arbitrary, capricious or contrary to law, the APA does not afford a vehicle for enjoining possible future agency actions."); *Dine Citizens Against Ruining Our Environment v. Jewell*, 2015 WL 4997207, at * 46 (D.N.M. Aug. 14, 2015).[11]

For these reasons, the Court concludes that the voluntary cessation exception to the mootness doctrine does not apply here. Plaintiffs' NEPA claims challenging the 2007 EAs are moot. Defendant is granted summary judgment on the NEPA claims.

### C.     After-the-fact Consideration of the FONSI/SEA

Plaintiffs also argue the Court should decide its NEPA claim "after-the-fact" and consider whether the 2017 FONSI/SEA cured the NEPA violations alleged to have been committed in the 2007 EAs. (Dkt. 87 at 12.) Defendants maintain the merits of the 2017 FONSI/SEA are not before the Court as Plaintiffs failed to contest the same in accordance with the APA nor plead such a claim in their Complaint. (Dkt. 89 at 11-12.)

---

[11] This case is distinct from *Sequoia Forestkeeper v. Benson*, 108 F.Supp.3d 917, 928 (E.D. Cal. 2015) cited by Plaintiffs. In that case, the Court concluded declaratory relief regarding the project's compliance with NEPA would provide meaningful relief in the context of the "capable of repetition test" to mootness which examines the likelihood of the issue resurfacing. *Id.* Voluntary cessation, the exception applicable here, looks to the specific activity challenged. *Id.* at 927-26 (recognizing the distinction between the two mootness exceptions).

In the case cited by Plaintiffs, *Friends of Clearwater v. Dombeck*, 222 F.3d 522 (9th Cir. 2000), the Ninth Circuit concluded the supplemental studies and analysis conducted by the agency after the case was filed could be considered when addressing the alleged NEPA violations. The facts in that case, however, are distinguishable from this case. Here, APHIS has not just submitted supplemental materials but has instead issued a supplemental NEPA document; the 2017 FONSI/SEA. That distinction is dispositive. Unlike *Friends of Clearwater*, the Plaintiffs here are not asking the Court to merely consider newly submitted materials in regards to the 2007 EAs but, instead, argue the Court should undertake a wholesale NEPA analysis of the 2017 FONSI/SEA. Doing as Plaintiffs suggest is not an "after-the-fact" analysis but is instead a full-fledged NEPA review of the 2017 FONSI/SEA which must be done in accordance with the APA. Because the 2017 FONSI/SEA supersedes the 2007 EAs upon which Plaintiffs' NEPA claim is based, Plaintiffs' NEPA claims are moot as to the 2007 EAs. Claims alleging the 2017 FONSI/SEA violates NEPA must be raised as provided for by the APA. For these reasons, summary judgment is granted in favor of Defendants on the NEPA claim.

**4.    Tenth Amendment**

Plaintiffs' final claim alleges APHIS violated the Tenth Amendment by threatening a statewide quarantine which coerced the state of Idaho into adopting the federal PCN Program and, later, commandeering state officials to enforce the federal protocols and regulatory program. (Dkt. 1 at ¶¶ 145-149) (Dkt. 75 at 38-45) (Dkt. 87 at 18-20.) Defendants counter that the Final Rule is a proper exercise of their broad commerce powers

and they did not unlawfully coerce the state nor commandeer state officials. (Dkt. 84 at 37-45) (Dkt. 89 at 14-18.)[12]

The Tenth Amendment states: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. CONST. AMEND. X. The Amendment's purpose is to "allay fears that the new national government might seek to exercise powers not granted, and that the states might not be able to exercise fully their reserved powers." *United States v. Darby*, 312 U.S. 100, 124 (1941).

Laws affecting the "health and welfare of citizens have traditionally fallen under the police powers reserved to the States." *United States v. Norton*, No. CR 07-0683-DLJ, 2010 WL 2757033, at *2 (N.D. Cal. July 9, 2010) (citing *Raich v. Gonzales*, 500 F.3d 850, 867 (9th Cir. 2007)). When "Congress acts pursuant to one of its enumerated powers, however, it may displace the States' exercise of police powers." *Id.* (quoting *Hodel v. Va. Surface Mining and Reclamation Ass'n, Inc.*, 452 U.S. 264, 291 (1981)). Generally, then, "if Congress acts under one of its enumerated powers, there can be no violation of the Tenth Amendment." *Id.* (quoting *United States v. Jones*, 231 F.3d 508, 515 (9th Cir. 2000)).

Under the Tenth Amendment, however, "Congress may not simply commandeer the legislative process of the States by directly compelling them to enact and enforce a federal regulatory program." *New York v. United States*, 505 U.S. 144, 161 (1992) (internal

---

[12] The State of Idaho is no longer a party to this action but has filed a Motion for leave to file an amicus curiae brief on the Tenth Amendment issue raised in the summary judgment briefing. (Dkt. 92.) The Court has denied that Motion in a separate Order.

quotation omitted). "The Federal government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz v. United States*, 521 U.S. 898, 935 (1997). "That is true whether Congress directly commands a State to regulate or indirectly coerces a State to adopt a federal regulatory system as its own." *Nat. Fed. of Ind. Business v. Sebelius*, 567 U.S. 519, 576-77 (2012).

"The commandeering cases involve attempts by Congress to direct states to perform certain functions, command state officers to administer federal regulatory programs, or to compel states to adopt specific legislation." *Raich*, 500 F.3d at 867 n. 17 (9th Cir. 2007). "The touchstone of a Tenth Amendment 'commandeering' violation is not that federal action regulates individual behavior, but that it directly compels a state to take a specific action." *Norton*, 2010 WL 2757033, at *2 (citing *Raich*, 500 F.3d at 866). Whether a regulation amounts to a compulsion is a question of degree. *Id.* (citing *Charles C. Steward Mach. Co. v. Davis*, 301 U.S. 548, 590 (1937)).

Defendants here argue there is no Tenth Amendment violation because they were acting pursuant to their authority under the Commerce Clause. The Court disagrees. It is true that Congress does not invade "areas reserved to the States by the Tenth Amendment simply because it exercises its authority under the Commerce Clause in a manner that displaces the States' exercise of their police powers." *See Raich*, 500 F.3d at 867. The fact that APHIS was acting within its power to regulate interstate commerce does not, however, answer the Tenth Amendment issue raised here – whether APHIS violated the Tenth

Amendment by coercing/commandeering Idaho to enact and/or enforce the federal PCN Program. The Tenth Amendment does not allow the federal government to "commandeer" state action even when it is acting pursuant to one of its enumerated powers. *Id.* at 867 and n. 17 (distinguishing the "commandeering" line of cases which involve attempts by Congress to direct states to perform certain functions, command state officials to administer federal regulatory programs, or to compel states to adopt specific legislation) (citing *Printz supra, New York supra*, and *Reno v. Condon*, 528 U.S. 141, 151 (2000)). The Commerce Clause is the basis upon which the PPA gives APHIS the authority to regulate, quarantine, and monitor PCN infected potato fields in Idaho. *See* 7 U.S.C. § 7711(a); 7 C.F.R. §§ 2.22(a), 2.80(a)(36) (2010). That authority is not in dispute here. *Id.* The claim in this case is not that APHIS acted without authority but, instead, that it violated the Tenth Amendment by coercing and/or commandeering the state of Idaho to enact and enforce the federal PCN regulations. *Raich*, 500 F.3d at 867; *see also Board of Nat. Resources of State of Wash. v. Brown*, 992 F.2d 937, 946-47 (9th Cir. 1993). The Court takes each of those issues below.

A.    **The State's Adoption of the Interim and Final Rules**

APHIS issued its Federal Domestic Quarantine Order on August 28, 2006 which identifies the particular areas designated as "regulated areas" for PCN quarantine in Idaho and states:

> Less than an entire state will be designated as a regulated area only if the Administrator determines that:
>
> > (1) The State has adopted and is enforcing restrictions on the intrastate

movement of the regulated articles that are substantially the same as those imposed by the Administrator on the interstate movement of regulated articles; and

(2) The designation of less than the entire state as a regulated area will be sufficient to prevent the interstate spread of PCN.

(RM 595.) On June 26, 2007, the State of Idaho adopted Temporary Administrative Rules Governing PCN which temporarily changed Idaho's PCN regulations "to parallel the proposed federal interim rule" for the purpose of "avoid[ing] having a federal quarantine placed against the entire state." (Dkt. 52, Ex. E6.)[13] The 2007 Interim Rule was published in the Federal Register on September 12, 2007 and became effective on November 1, 2007. (RM 438.) On that same day, November 1, 2007, ISDA instituted its Rules Governing PCN in Idaho, IDAPA §§ 02.06.10.000-.020, which paralleled and incorporated APHIS's Interim Rule and protocols. (RM 433-36.)

The Final Rule was then published on April 29, 2009 and included the same requirement that in order to avoid a state-wide quarantine, ISDA must adopt and enforce PCN restrictions equivalent to those required by APHIS. (RM 1.) Thereafter, ISDA enacted temporary Rules Governing PCN for the state of Idaho which again paralleled and incorporated the Final Rule. *See* IDAPA §§ 02.06.10.000-.020. ISDA's purpose for passing the temporary PCN Rules continued to include "avoid[ing] having a federal quarantine placed against the entire state." (Dkt. 52, E5-E8.)

---

[13] Plaintiffs point to several documents (Dkt. 52, "E" Exhibits) previously determined to not be a part of the Administrative Record. (Dkt. 69.) Defendants oppose the Court's consideration of these documents here as irrelevant. (Dkt. 84 at 38, n. 12.) The Court finds the documents cited herein are relevant and appropriate for its consideration on this issue.

Plaintiffs argue the Defendants violated the Tenth Amendment because they coerced the state of Idaho to adopt the Interim and Final Rules by threatening a statewide quarantine. (Dkt. 75, 87.) Defendants counter arguing the Tenth Amendment was not violated because the state retained the ultimate decision to choose between regulating PCN according to federal standards or face a statewide quarantine. (Dkt. 84 at 41-42) (Dkt. 89 at 16.) Plaintiffs maintain that "option" or "choice" amounts to coercion of the state because it was akin to a "gun to the head" leaving the state with no real choice but to implement the PCN Program. (Dkt. 75 at 40.)

While the federal government may not compel a state to implement, by legislation or executive action, a federal regulatory program, it may "encourage" a state to regulate in a particular way by offering incentives to the state. *Envtl. Def. Cntr., Inc. v. United States EPA*, 344 F.3d 832, 847 (9th Cir. 2003) (citing *New York*, 505 U.S. at 166–68). "For example, the federal government may make certain federal funds available only to those States or municipalities that enact a given regulatory regime." *Id.* (citing *South Dakota v. Dole*, 483 U.S. 203, 205–08 (1987) (upholding federal statute conditioning state receipt of federal highway funds on state adoption of minimum drinking age of twenty-one)). "The crucial proscribed element is coercion; the residents of the State or municipality must retain 'the ultimate decision' as to whether or not the State or municipality will comply with the federal regulatory program." *Id.* (quoting *New York*, 505 U.S. at 168). "[A]s long as 'the alternative to implementing a federal regulatory program does not offend the Constitution's guarantees of federalism, the fact that the alternative is difficult, expensive or otherwise

unappealing is insufficient to establish a Tenth Amendment violation.'" *Id.* (quoting *City of Abilene v. United States EPA*, 325 F.3d 657, 662 (5th Cir. 2003)).

Under the PPA, APHIS has the authority to regulate PCN in Idaho on its own, without any state involvement or action. *See* 7 U.S.C. § 7711(a). The Interim and Final Rules, however, gave Idaho the choice to either participate in the regulation by adopting and enforcing the PCN Program or leave the same to APHIS and face a statewide quarantine. (RM 1, 438, 595.) The Court finds that choice does not amount to coercion. Both options available to the state are constitutionally permissible under APHIS's authority arising from the Commerce Clause and the PPA. The ramifications of the choice to the state were obviously onerous given the importance of the potato industry to the state of Idaho. (Dkt. 75 at 44.) That the alternatives presented to the state were "difficult…or otherwise unappealing is insufficient to establish a Tenth Amendment violation." *Envtl. Def. Cntr.*, 344 U.S. at 847 (citation omitted). The fact remains that the state had the ultimate choice between two constitutionally viable options and, therefore, there was no Tenth Amendment violation. *Id.* at 847-48.

The parties appear to disagree concerning whether the Final Rule regulates the state or private individuals and the implications of that distinction. (Dkt. 87 at 19) (Dkt. 89 at 15-16.) It is clear to the Court that the Final Rule directly regulates individual farmers which, under the Tenth Amendment, the federal government cannot require, coerce, or commandeer the state into doing. *See Reno*, 528 U.S. at 672 (discussing the distinction in *Baker* which upheld a statute that regulated state activities as opposed to controlling the

manner in which states regulated private parties). Here, however, the Final Rule does not compel or require the state to take a specific action. *See Norton*, 2010 WL 2757033, at *2. The state had a choice between participating in the regulation of PCN by adopting and enforcing the regulations or leaving the regulation of PCN in Idaho to the federal agency to enforce on its own resulting in a statewide quarantine. While Plaintiffs argue those alternatives amount to coercion, the Court disagrees and concludes there was no violation of the Tenth Amendment.

### B.    ISDA's Post-Regulation Monitoring and Testing of Released Fields

Plaintiffs argue APHIS violated the Tenth Amendment by commandeering ISDA to enforce the post-regulation monitoring and testing of released fields. (Dkt. 75 at 42-45) (Dkt. 87 at 20.)[14] Defendants assert the Administrative Record shows the relationship between APHIS and ISDA was one of mutual cooperation and collaboration and that monitoring the fields was a "joint endeavor." (Dkt. 84 at 44-45) (Dkt. 89 at 18.)

Having reviewed the Administrative Record, the Court concludes the post-regulation monitoring by ISDA was not an unconstitutional commandeering of the state in violation of the Tenth Amendment. Although the possibility of a statewide quarantine was a significant factor in the state's decision, the state still had the ultimate decision over whether to adopt and enforce the regulations prescribed in the Final Rule or to leave PCN

---

[14] Defendants contend the Tenth Amendment claim did not include allegations concerning post-Final Rule conduct. (Dkt. 84 at 43-44.) The Court disagrees and finds the Complaint raises a Tenth Amendment challenge to APHIS's post-regulation monitoring. (Dkt. 1 at ¶¶ 73-80, 145-149.)

enforcement to the federal agency. (Dkt. 52, Ex. E5-E8.) The state elected to adopt and enforce the regulations. Likewise, the record reflects the state chose to participate in the post-regulation monitoring of released fields.

In 2008 and throughout 2011, the USDA requested assistance from the ISDA to conduct additional post-regulation surveys of released fields. (DEREG 1223, 1307, 1490-97.) ISDA agreed to assist in the post-regulation surveys. (DEREG 1491, 1494-96.) The Administrative Record shows the post-regulation monitoring and surveying of deregulated fields has been a cooperative effort between the state and federal agencies. (DEREG 1066-69, 1072-74.) The agencies exchanged several communications regarding the purpose and need for the post-regulation monitoring and coordinated numerous times on the specifics of how the surveys would be carried out and the procedures to use for the monitoring. (DEREG 1253-54, 1307, 1490-97.) The Court finds these communications and other materials in the Administrative Record show the monitoring program of de-regulated fields in Idaho was an ongoing interagency cooperative effort between the USDA and ISDA which ISDA supported by choosing to assist with the post-regulation field surveying. (DEREG 1063-74, 1490-97.)

Plaintiffs contend the record shows that the state was commandeered as evidenced by the fact that APHIS gave varying reasons for requesting ISDA's assistance with the monitoring. (Dkt. 75 at 42-43.) The record shows that initially, APHIS stated the continued monitoring was needed in order to comply with the U.S./Canada PCN Guidelines. (DEREG 1490.) Later, APHIS recognized that those guidelines do not contain a post-regulation

monitoring requirement but maintained that the continued surveying of the released fields was essential to the PCN program. (DEREG 1223, 1492.) Plaintiffs argue the real reason APHIS sought the state's assistance was because its PCN Program's release protocols had proven inadequate and APHIS lacked the authority to enter private land, so it needed and thus commandeered ISDA to do what it could not do - conduct the post-regulation surveying. (Dkt. 75 at 43-45.)

The Court finds that neither APHIS's varying reasons for requesting ISDA's assistance, nor the fact that ISDA had the authority to test the privately owned fields show the state was commandeered to enforce the post-regulation monitoring regime. The Court finds the ongoing exchanges between APHIS and ISDA in the Administrative Record cited above, establish that the state chose to assist APHIS in the post-regulation monitoring survey of released fields; not that the state was coerced or commandeered.

Plaintiffs also point to a October 4, 2011 letter from APHIS to the ISDA wherein APHIS expresses its position that post-regulation monitoring should continue and is important in order to maintain confidence in the status of PCN in Idaho without which APHIS "will be required to increase the size of the Federally regulated area for PCN to all or part of the State so that we can protect domestic and foreign markets." (Dkt. 75 at 45) (DEREG 1223.) This letter, Plaintiffs argue, shows APHIS commandeered ISDA into enforcing the federal PCN Regulations by again threatening a statewide quarantine. The Court disagrees.

The letter sets forth the same position APHIS had consistently expressed previously

– that APHIS may expand the quarantined area pursuant to its authority under the PPA absent the state adopting and enforcing an effective PCN regulatory program. (DEREG 1223.) The state was well aware of that position when it agreed to assist with post-regulatory field surveying in 2008, years before the 2011 letter. (DEREG 1490-97.) As discussed elsewhere in this Order, the fact that APHIS had the authority to impose a statewide quarantine on Idaho does not show the state was coerced or commandeered because the state retained the ultimate choice as to whether or not to participate in the regulation of PCN with APHIS.

Plaintiffs also point out that concerns were raised regarding post-release monitoring at a November 17, 2011 meeting. (Dkt. 87 at 20.) The record of that meeting, however, does not show the state was commandeered into enforcing federal regulations. (DEREG 1201-02.) The comments expressing concern appear to have been raised by individuals, not state officials. Again, the Administrative Record discussed above demonstrates that the state was working in cooperation with APHIS.

For these reasons, the Court finds the state was not commandeered into conducting the post-regulation monitoring of released fields. Defendants' Motion for Summary Judgment is granted and Plaintiffs' Motion for Summary Judgment is denied on the Tenth Amendment claim.

## 5.    Remedies and Remand without Vacatur

In the Complaint, Plaintiffs seek declaratory relief; vacatur of the Final Rule, Deregulation Protocols, and the Idaho PCN Rules; and ask the Court to enjoin APHIS and

ISDA from enforcing the rules and protocols and end the quarantine and regulation of Plaintiffs' fields. (Dkt. 1 at 27, ¶¶ 1-6.)[15] Plaintiffs further seek to prohibit APHIS from relying on the recommendations from TWG when reaching future agency decisions. (Dkt. 87 at 5, n. 7.)

The APA governs judicial review of APHIS's decisions and actions in this case and provides that courts "shall hold unlawful and set aside agency actions...found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. "Ordinarily[,] when a regulation is not promulgated in compliance with the APA, the regulation is invalid" and the agency rule or regulation promulgated in violation of the APA will be vacated. *Idaho Farm Bureau Fed. v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995). "[H]owever, when equity demands, the regulation can be left in place while the agency follows the necessary procedures." *Id.*

Whether to remand a rule or regulation to an agency without vacatur depends on: (1) the seriousness of the rule's deficiencies (and thus the extent of doubt as to whether the agency chose correctly in the first instance) against (2) the disruptive consequences that would flow from vacatur of the agency's rule. *Cal. Communities Against Toxics v. United States EPA*, 688 F.3d 989 (9th Cir. 2012) (citation omitted); *see also Gov. C.L. "Butch" Otter v. Salazar*, Case No. 1:11-cv-00358-CWD, 2012 WL 12517198, at *2-3 (D. Idaho Dec. 4, 2012). Under this two-part test, if the potential disruptive consequences of vacating

---

[15] Plaintiffs also seek attorney fees and costs. (Dkt. 1 at 28, ¶ 7.) If appropriate, such relief may be sought separately in accordance with Local Civil Rules 54.1 and 54.2.

the agency's rule outweigh the seriousness of the deficiencies in the flawed rule, remand without vacatur may be the appropriate remedy. *Id.* In making this determination courts consider: "(1) the purposes of the substantive statute under which the agency was acting; (2) the consequences of invalidating or enjoining the agency action; (3) the magnitude of the administrative error and how extensive and substantive it was; and (4) the likelihood that the agency will be able to correct the error on remand." *Otter*, 2012 WL 12517198, at *3 (citation omitted). Applying these factors here, the Court finds as follows as to the two claims upon which Plaintiffs have prevailed.

### A.     Relief for Violation of Rulemaking Requirements

Plaintiffs prevailed on their claim that Defendants violated the legislative rulemaking requirements by failing to provide the requisite public notice and commenting procedures before adopting the Interim and Final Rules, specifically the Deregulation Protocols. On this claim, however, the Court denies Plaintiffs request to vacate the Deregulation Protocols, end the quarantines, and/or preclude Defendants from enforcing the same.

The seriousness of the deficiencies here is procedural. Failing to allow for public notice and commenting infringes on the rights of the public and interested parties to have a say in the rulemaking process. This is an important interest to the public that goes to the purpose of the statute under which Defendants were acting when issuing the Interim and Final Rules. That being said, the Court finds the seriousness of those procedural interests are outweighed by the disruptive consequences that will flow from vacatur of the agency's

Rules.

The consequences that would likely result from vacating or enjoining the Deregulation Protocols or unquarantining any fields on remand will have significant immediate and long-term consequences to both the state of Idaho as well as the United States as a whole. Both parties recognize the importance of potato crops to Idaho. (Dkt. 75 at 44) ("Idaho's potato industry ranked first among states and represented 29% of U.S. production in 2010…."), (Dkt. 84 at 3, 40), (Dkt. 87 at 20.) The Administrative Record also reflects the significant value of potato crops, potato production, and potato exports to both Idaho as well as the United States. (RM 443-44) (The United States ranks fourth in the world in potato production and is a net exporter of potatoes and processed potatoes with potato exports accounting for approximately one-third of the value of farm sales.) The discovery of PCN in Idaho necessitated the need for the quarantine program to be initiated on an "emergency basis" in order to protect those important interests by eradicating and preventing the spread of PCN to other noninfested areas of the United States. (RM 442-45.) In the long-run, the quarantine and PCN regulations will help to preserve consumer confidence, both nationally and internationally, in the potato crops of Idaho and the United States. Further, Idaho itself has a significant interest in avoiding a statewide quarantine which would likely result were the Final Rule, quarantine, and/or Deregulation Protocols vacated. (Dkt. 52, Ex. E5-E8.)

The Court has also considered the magnitude of the agency's procedural violation as well as the likelihood that the agency will be able to correct the error on remand and

finds this factor weights against vacatur. The Administrative Record shows the agency did provide some notifications to the public of the protocols and regulations to be implemented. (DEREG 725, 814, 1280.) Additionally, Plaintiffs had some input into the development of rules and protocols for regulating PCN. (DEREG 770, 881, 987-1010.) While these portions of the Administrative Record do not show the agency satisfied the statutory notice and comment requirements, they do demonstrate that the agency's procedural error in this case was not extensive nor wholly preclusive of public involvement in the process. Further, the Court finds it likely that the agency will be able to correct the procedural error on remand by initiating the requisite public notice and commenting procedures as detailed below.

In sum, the Court finds in the balancing of the equities in this case that the important interests harmed by the Defendants' procedural violations are outweighed by the disruptive consequences that would result from vacatur of the agency's rule at this time. *See Idaho Farm Bureau Fed.*, 58 F.3d at 1405-06. Therefore the Court will temporarily retain the Final Rule, the Deregulation Protocols, and the quarantines and will allow APHIS and ISDA to continue to enforce the same. This matter is remanded and the Defendants are hereby ordered to immediately begin the process of providing the requisite public notice and commenting on the Deregulation Protocols. Defendants shall also provide any new or updated information they intend to consider, if any. The protocols will temporarily remain in effect until Defendants have completed such process. Following completion of the requisite notice and commenting process, Defendants shall issue an appropriate concluding

finding or new Deregulation Protocols in accordance with all applicable statutory requirements. In doing so, Defendants are ordered to specifically address the steps taken to ensure satisfaction of the notice and comment procedures and any and all other statutory requirements. Furthermore, Defendants are ordered to satisfy the applicable public notice and comment requirements for all future actions relating to PCN regulation.

### B. Relief for Violation of FACA

Plaintiffs also prevailed on their claim that APHIS violated FACA by establishing and utilizing TWG as an advisory committee without satisfying the FACA's procedural requirements to ensure the public was apprised of and able to participate in the process. In balancing the equities on this claim, however, the Court finds the seriousness of the agency's procedural violations outweigh the potential disruptive consequences of vacating the agency's actions.

APHIS's FACA violation is again procedural, going to the public's important interest in participating in the process of developing the rules and protocols for regulating PCN. That interest is at the heart of what FACA is designed to protect.[16] Unlike the rulemaking violation above, the agency's FACA violation is more substantive and

---

[16] FACA was enacted out of "a desire to assess the need for the numerous committees…which have been established to advise officers and agencies in the executive branch of the Federal Government. ... Its purpose was to ensure that new advisory committees be established only when essential and that their number be minimized; that they be terminated when they have outlived their usefulness; that their creation, operation, and duration be subject to uniform standards and procedures; that Congress and the public remain apprised of their existence, activities, and cost; and that their work be exclusively advisory in nature." *Lawyers' Comm. for Civil Rights Under Law v. Pres. Advis. Comm'n on Election Integrity*, 265 F.Supp.3d 54, 59 (D.C. 2017) (quoting *Pub. Citizen v. United States Dep't of Justice*, 491 U.S. 440, 445–46 (1989)).

**ORDER- 41**

extensive because it does not appear that the public was afforded any notice or opportunity to participate in the discussions, recommendations, and/or input provided to the agency by TWG. Nor is there anything in the record showing the public was apprised of the existence, activities, and costs of TWG or any assurances that TWG was not dominated by industry representatives or special interest groups seeking to advance their own agendas. *See Idaho Wool Growers*, 637 F.Supp.2d at 880. These interests are central to FACA's purpose. *Id.*

The Court further finds it unlikely the agency will be able to correct the violations on remand. TWG convened several times over the course of the years that the PCN protocols were developed and it is impossible to simply erase the information and recommendations provided by TWG to the agency during that time. Nor is it possible to recreate the discussions that transpired or repair the denial of the Plaintiffs' right to participate in a transparent decision-making process. Plaintiffs have been significantly prejudiced and irreparably harmed as a result of the Defendants' failure to adhere to FACA's procedural requirements. Therefore, the Court orders as follows.

Defendants shall make available, at Plaintiffs' request, all past recommendations and/or information produced by TWG. Plaintiffs shall be afforded a reasonable opportunity to review the past materials and comment and/or challenge the past recommendations and/or information as well as to challenge the rules and protocols adopted based upon TWG's past recommendations. Defendants shall provide an appropriate response and, if necessary, reopen discussions on the rules and protocols, or issue new rules/protocols incorporating and addressing Plaintiffs' comments and/or challenges to the past materials.

**ORDER- 42**

As to future agency actions, Defendants are prohibited from relying on any past recommendations and/or findings of TWG. *Idaho Wool Growers*, 637 F.Supp.2d at 880. If TWG, or any other advisory committee, is assembled in the future to provide recommendations concerning the PCN protocols, Defendants are hereby ordered to comply with FACA's procedural requirements in every respect.

## ORDER

NOW THEREFORE IT IS HEREBY ORDERED as follows:

1. Plaintiffs' Motion for Summary Judgment (Dkt. 75) is **GRANTED IN PART AND DENIED IN PART**.

2. Federal Defendants' Motion for Summary Judgment (Dkt. 84) is **GRANTED IN PART AND DENIED IN PART**.

3. This matter is **REMANDED** with instructions and the case is **CLOSED**. If necessary, one or both parties may seek to reopen the case in order to clarify or enforce the Court's remand.

DATED: March 20, 2018

Honorable Edward J. Lodge
United States District Court